GIBSON & JENNINGS, Inc., v. AMOS DRILLING CO. et al.

No. 31682. June 26, 1945.

Rehearing Denied Oct. 23, 1945.

Application for Leave to File Second Petition for Rehearing Denied Nov. 20, 1945.

*162 P. 2d 1002.*

144

Earl Q. Gray and John M. Poindexter, both of Ardmore, for plaintiff in error.

Geo. N. Otey and R. Rhys Evans, both of Ardmore, for defendants in error.

BAYLESS, J. Amos Drilling Company, a corporation, hereafter referred to as Amos, and Irven E. Gibbons, hereafter referred to as Gibbons, as plaintiffs, instituted an action in the district court of Carter county, Okla., against Gibson & Jennings, Inc., a corporation, hereafter referred to as G. & J., and Gulf Oil Corporation, a corporation hereafter referred to as Gulf, as defendants, and the defendant G. & J. appeals from a judgment in favor of the plaintiffs. The plaintiffs filed a petition alleging that they were the owners in specified undivided interests of an undivided one-half interest in and to the oil, gas, minerals, and mineral rights under the northwest quarter of the southwest quarter of 20-4-2 in Carter county, and alleging further that defendants claim some right, title, and interest in and to the mineral rights above described, and asking to have their title quieted as against the defendants. The defendants filed a joint answer in which, in substance, they set up an existing valid oil and gas lease covering said one-half mineral interest and asked that plaintiffs be denied any relief. The plaintiffs thereupon filed a lengthy reply in which they pleaded that, (1) said lease had expired at the end of its primary term without development; (2) the defendants had abandoned said leased premises; and, (3) plaintiffs were entitled to have said lease canceled because of breaches of the express and implied covenants of the lease contract. At the commencement of the trial the defendants were permitted to file what was considered a rejoinder wherein they took issue with the affirmative allegations in the reply that were adverse to the allegations of their answer. It was upon these issues that the case was tried.

A summary statement of the salient facts disclosed by the evidence of all of the parties made at this point will be helpful to an understanding of the contentions made. Late in 1933 and early in 1934 a number of leases were executed, the title to which eventually vested in G. & J. covering the 40 acres above described and 70 acres lying immediately north and northeast thereof. In one of these lease contracts the entire 110 acres was included, covering one-half of the mineral rights, and it is this lease, including the minerals under the particular 40 above described, that is involved in this controversy. In September, 1936, G. & J. began a well on the S.E. S.E. N.W., north and east of this particular 40, and brought in a well (at a depth of less than 2,500 feet) and the commercial aspect of this well, for the purpose of constituting production within the terms of the lease, is now questioned by plaintiffs. Shortly before this well was commenced, G. & J. assigned its interests under the 110 acres

below a depth of 2,500 feet to Gulf. Despite the probability that this well was regarded by some as a commercial well, Gulf paid delay rentals to plaintiffs until the expiration of the primary term specified in the lease, which was late in 1938. In March, 1939, Amos wrote a letter to Gulf, in substance, calling attention to the expiration date of the lease and asking if it was not considered that the lease had expired, and requesting to know whether a release had been recorded, and if not, when it would be recorded. There was no answer to this letter, and on April 4, 1939, Amos wrote a second letter of similar tenor to Gulf. On April 24th, Gulf wrote a letter to Amos in reply to these two letters stating, in substance, that a well had been drilled on the leased premises and it was considered that the lease was continued in force and effect by reason thereof. One of the officers of G. & J. testified that he was informed by Gulf of the writing of these letters about the time the correspondence took place. In December, 1940, G. & J. began a second well on the 10 acres above described, due east of the first well drilled, and completed it early in January, 1941, and there does not seem to be much contention about this being a commercial well. In 1941, beginning about the middle of March and extending to August 30th, G. & J. drilled 18 wells on the 60 acres north of the 40 in question, and it is shown that these wells were very productive and highly profitable. These wells were all brought in at a depth of less than 2,500 feet and apparently were begun and finished in about ten days each, and there was an interval of about ten days between the completion of one well and the beginning of the next. In the meantime G. & J. had released a lease which they had from the owners of the other one-half interest of the minerals on the 40 acres in question, and these owners had released their one-half of the minerals under this 40 to Dave and Leon Daube. The last three of the 18 wells above mentioned were located about 165 feet north of the north line of this 40, two of them being located in the S.E. S.W. N.W. and one

on the west side of the S.W. S.W. N.W. In September, 1941, the Daubes' royalty owners demanded of the Daubes that they develop under their lease to protect against the drainage of the three wells above mentioned. The last of these wells was completed August 30th, and the letter to the Daubes was dated September 2nd. September 5, 1941, the Daubes entered into a contract with G. & J. whereby G. & J. agreed to act as the drilling contractor for the drilling of certain wells which the Daubes were to drill. It is agreed that G. & J., as cotenant lessees with the Daubes, did not participate in the drilling of this well as part performance of any of their obligations under their lease with plaintiffs, although the Daubes requested G. & J. to co-operate in the drilling of the wells, which request was refused. It acted as such drilling contractor and was paid for its services as though it was a complete stranger to the leasehold estates. The first well drilled by the Daubes was commenced September 10th and finished September 24th, and the third one was commenced November 19th and finished November 27th. It is shown in the record that all three of these wells were less than 2,500 feet in depth, and it is not disputed that they were commercial wells. In the meantime and on September 29th, plaintiffs herein wrote a letter to the Daubes advising them that they were the owners of the other one-half of the minerals under this 40 unaffected by any lease, and demanding that the Daubes account to them accordingly. The action out of which this appeal arises was filed by the plaintiffs November 12, 1941. At no time prior to the filing of the action did plaintiffs serve notice of demand on G. & J. to develop.

The Daubes and their lessors are not parties, and the one-half interest of the minerals under this 40 owned and claimed by them was not involved in the action and is not involved in this appeal. The Daubes, we are told, have impounded the income from the one-half interest in the minerals now in dispute for the purpose of reimbursing themselves for the expenses in the de-

velopment of this lease and for the purposes of distribution in a manner that will protect their interests when this litigation is finished. The references which we make to them herein are solely for the purpose of relating the history of the case.

As stated, Gulf was made a party defendant by the attack on the lease under which it held, which attack was rejected insofar as Gulf was concerned. Gibbons and Amos, who were the attackers, do not cross-appeal herein to complain of the judgment rendered against them and in favor of Gulf. Though G. & J. has made Gulf a party to the appeal as one of the defendants in error, it makes no complaint of the judgment rendered in favor of Gulf. Therefore, we must consider Gulf's judgment as final and as being unaffected by the outcome of this appeal.

Before commencing a discussion of the judgment rendered and the contentions urged for its reversal, we think it pertinent to observe that under the pleadings there were at least three ways in which this lease could be considered terminated. It could have expired by its own terms at the end of its primary term by reason of nondevelopment. The lessees could have abandoned the leased premises. The lessees could have breached· the express and implied covenants so as to render themselves subject to the relief accorded by courts in such instances.

The judgment of the trial court did not specify the grounds for cancellation. The trial judge merely found that "No equities exist in favor of Gibson and Jennings, Inc., that in the exercise of its equitable jurisdiction the effectuation of justice between all parties requires the quieting of the plaintiffs' title." We approach the consideration of judgments attacked on appeal by allowing them every reasonable presumption of correctness and as having some basis in law. This applies to appeals in equitable matters in view of the adage that equity follows the law. In our opinion there is not so much controversy over the truth and falsity of the evidence as there is over its effect in law. It was not difficult for us to follow the history of this controverted lease from the evidence of either side and thus arrive at the same conclusion about what was actually done. While it is true that there is testimony from several witnesses regarding motives, and these motives are hotly attacked in the arguments, this is not sufficient to create a difficult problem in determining the weight and value of the evidence.

G. & J. presents six propositions on appeal. In the plaintiffs' answer brief they premise their discussion by stating three counterpropositions which broadly state the presumptions in favor of the correctness of judgments in equity matters, and the weight of the evidence that exists in their favor by virtue of the trial court's judgment. They thereupon begin an answer to the six propositions, taking them up in order. We observe that they concede the correctness of the first two, and we therefore treat as settled in favor of G. & J. these facts, (1) the lease did not expire with the primary term, and (2) the lease on the entire 110 acres is one lease and the plaintiffs' purchase of one-half of the royalty under the particular 40 subsequent to the execution of the lease did not affect G. & J.'s obligation as lessees under the lease.

The sixth proposition urged by G. & J. is that there is no evidence of abandonment. Plaintiffs admit that since the decisions of this court in Doss v. Texas Co., 192 Okla. 359, 137 P. 2d 934, and Ferguson v. Gulf, 192 Okla. 355, 137 P. 2d 940, there can be no abandonment of an oil and gas lease predicated on the breach of implied covenants alone. They do, however, urge that there is evidence in the record sufficient to support the trial court's finding of an intention to abandon the lease accompanied by a physical relinquishment, which of itself calls for the affirmance of the decree. Putting aside for the time being the testimony relating to whether plaintiffs had sufficiently disputed G. & J.'s title at the time the Daubes began their

drilling on this 40 to justify G. & J. in declining to participate therein, which we discuss under another heading, there remains no other evidence to support the trial court's judgment and the plaintiffs' argument in this respect other than the lapse of time which passed between the execution and delivery of the lease and the filing of this action. Upon consideration of this period of time as modified and affected by the drilling scheme which G. & J. carried out on other parts of the leased premises, and considering the plaintiffs' acquiescence in the assumption that the lease did not terminate with its primary term and their acceptance of the royalties that came from the developments on the other portions of the leased premises, we are of the opinion that there is not sufficient proof in this record to justify a finding of abandonment. We observe, as stated above, that earlier G. & J. had voluntarily released, at the end of its primary term, a separate lease which they held on the other undivided one-half interest in the minerals under this 40, but plaintiffs do not cite or rely upon this as any evidence as a state of mind with respect to this 40 acres; and since neither side discussed it in their briefs, we assume that it is not regarded as of material significance.

This leaves, then, the third, fourth, and fifth propositions of G. & J., which may be considered as broadly covered by the three counterpropositions as well as the direct argument against them offered by plaintiffs. The third proposition is that the plaintiffs' disputing or questioning of G. & J.'s title under its lease justified it in withholding further development and denied plaintiffs any right to complain thereof. In the fourth proposition G. & J. contend that plaintiffs cannot claim a forfeiture here because they never, during the term of the lease, demanded development. The fifth proposition is that plaintiffs cannot complain because there has not been any delay or damage when the history of this development has been considered.

We take up the fourth proposition next because we are of the opinion that the authorities cited by G. & J. support that contention in the light of the facts of this case. Both parties cite and rely on Utilities Prod. Corp. v. Riddle, 161 Okla. 99, 16 P. 2d 1092, which holds that a court of equity will not cancel an oil and gas mining lease for a failure to comply with an implied covenant to develop unless a request has been made therefor for the purpose of putting the lessee on notice of an intention to claim a cancellation otherwise, and which also holds that this rule does not govern if the circumstances are such as to excuse the necessity to give such notice.

We are impressed with the argument that G. & J. makes concerning the inconsistency of the plaintiffs' positions in the beginning. They were insisting on the one hand that the lease had expired at the end of its primary term by reason of nondevelopment, and this, of course, was contrary to the position that they were entitled to cancel the lease at any time after the primary term for the breaches of the implied covenant of the lease. Of course, this inconsistency has been removed here by the plaintiffs' concession that the lease did not expire at the end of its primary term. However, until the plaintiffs brought themselves of a mind to make this concession they were by reason of these two views unable to contend that the lease had expired and at the same time serve notice of a request or demand for development. As stated above, they did not serve notice of such demand. We are of the opinion that this aspect of the case favors G. & J.'s position, and we arrive at this conclusion somewhat in view of the opinion we have reached with respect to the third proposition.

We are of the opinion that the evidence supports G. & J.'s contention that there was no damage done to plaintiffs as the result of the delay in drilling on the 40 acres in question. Whatever may be said with respect to the effect of the delay in the development between the drilling of the first well on this 110 acres and the drilling of the first of the 18 wells drilled in 1941, all of this was

covered and cured by the plaintiffs' acquiescence in G. & J.'s assumption of a right to develop further on this 110 acres and by acceptance of the royalties therefrom. When development began north of the present 40 acres, G. & J. was, of course, governed by the rules that customarily control a prudent operator in the development of a lease. It is elementary that neither the lessor nor the lessee is the sole arbiter of how development should be carried on, but in view of the fact that the lessee is usually the active party, the scheme of development adopted and followed by the lessee will not be condemned in the absence of a substantial showing of prejudice or damage resulting therefrom. The record in this case will not justify any contention of delay with respect to the scheme of development once development was begun on the north part of this lease and conducted in a southerly direction toward the 40 acres in question.

That brings us squarely to the third proposition, which involves judging the conduct of the plaintiffs toward the holders of the leases in order to determine whether the plaintiffs had done anything to cause G. & J. to believe that their title to the lease was under attack so as to relieve them of the duty of proceeding further during the continuance of this attack. G. & J. cites Hudspeth v. Schmelzer, 182 Okla. 416, 77 P. 2d 1123, Chapman v. Bowers, 180 Okla. 49, 67 P. 2d 788, and the cases cited therein as well as Summers on Oil and Gas, section 160, and the authorities upon which its text is based, and we are of the opinion that these authorities justify its position as a matter of law. The plaintiffs devote little attention in their brief to the answering of these authorities, but cite in turn I.T.I.O. v. Haynes Drilling Co., 180 Okla. 418, 69 P. 2d 624. Upon reading this decision, and particularly the part cited by plaintiffs, we are of the opinion that it does not apply here. Insofar as G. & J. was concerned it had only one lessor and was obliged to one lessor only on this 40 acres. As pointed out in the I.T.I.O. Case, there was more than one lessor or owner of the royalty under the particular lease contract, and we said that the duty still remained on I.T.I.O. to drill for their benefit, even though other royalty owners under the particular lease contract might be attacking the lease.

The letters written by Amos to Gulf only back in 1939, at a time when Gulf had ceased paying delay rentals, is not subject to any other interpretation than that Amos at least was of the opinion that the lease was at an end. It does not appear that either Amos or Gibbons controverted the letter which Gulf wrote asserting that the lease was validly in existence by reason of the production on the lease. However, the promptness with which both attacked G. & J.'s title when the Daubes began development on this south 40 lends strong support to the view that the plaintiffs still retained the view that G. & J. had lost their lease rights to this 40. The letter from plaintiffs to the Daubes did not specify for what reason G. & J.'s lease ended. Unaffected by extraneous evidence the letter could have been based upon any or all of the reasons previously mentioned. At that time plaintiffs probably entertained them all, since they pleaded all of them sometime later. Thus at this time G. & J. stood liable to attack on the existence and validity of its lease on this 40, and because no demand had been made upon it to develop, it could not assume that plaintiffs recognized the existence of the lease even to the extent of serving as the basis of an action to cancel. It seems to us that, viewed retrospectively and prospectively, G. & J. had just cause to believe that plaintiffs stood in complete and adamant opposition to its claim of lease rights to this 40. Plaintiffs' efforts to minimize the effect of Amos' letters in 1939, and to cast doubt on the knowledge or belief of G. & J. about what their attitude was when G. & J. refused to co-operate with the Daubes, loses most of its argumentative force in the light of plaintiffs' letter of September 29th. In other words, G. & J. has as much reason and logic for

saying it anticipated plaintiffs' letter and attack and acted for its protection as plaintiffs have for saying that if G. & J. had co-operated with the Daubes in recognition of its lease contract obligation this lawsuit would not have been filed. It is well to remember that when plaintiffs sued, they pleaded their cause of action in such a fashion as to leave upon G. & J. the burden of offering the lease contract as validly existing, and it was only then that plaintiffs asserted all of the grounds of attack. It is reasonably clear that the first, the since abandoned claim that the lease expired with its primary term, was inconsistent with the third, the assertion of forfeiture for failure to develop.

Both sides cite and rely on Mid-Continent Petroleum Co. v. Earp, 167 Okla. 86; 27 P. 2d 855, and Moody v. Wagner, 167 Okla. 99, 23 P. 2d 633, with respect to the duties and privileges of co-tenants of leasehold estates, as the Daubes and G. & J. were in this instance. Upon consideration of these two decisions we are of the opinion that there is much in both applicable to the situation before us, but nothing that absolutely condemns the conduct of G. & J. in view of the then current opinion which plaintiffs entertained concerning the nonexistence and invalidity of their lease. It is pointed out in the briefs that this lease, having regard to the scheme of development used by G. & J. in the northern part thereof, was being drilled on 2½-acre locations, and it appears from the maps in the record that this is probably the same scheme the Daubes followed in drilling their three wells, because their wells are offsets to three drilled by G. & J. in which there is left, insofar as we can tell, one undeveloped 2½-acre location. As mentioned before, there was about a ten-day interval between locations in G. & J.'s scheme of development, and it will also be seen in the fact statement that the Daubes began their first well at about the same interval. Their first well was begun September 9th and completed September 24th. Their second well was begun October 25th. The Mid-Continent and Moody Cases, supra, are authority for the exclusive right of any co-tenant to the location which he stakes out and on which he begins a well. However, there is nothing in either case that precludes other tenants in common from staking locations and beginning wells under the obligations of their lease that do not conflict with locations already selected, nor is there anything in those decisions that requires a race between the parties for locations, and both cases expressly recognize the right of co-tenants to co-operate in the drilling of wells in performance of their respective obligations under their separate leases. Of course, it must be recognized in this case that G. & J. expressly refused to join with the Daubes in the drilling of these wells on this particular 40 in performance of the obligations that plaintiffs say rested upon them under their lease. Under the circumstances, we are of the opinion that this refusal was justified, and that nothing short of cautious observance of their rights was proper, considering the question that had theretofore been raised concerning the existence of their lease and the imminence of another attack thereon.

The judgment is reversed and the cause is remanded.

GIBSON, C.J., HURST, V.C.J., and OSBORN, WELCH, and CORN, JJ., concur. RILEY, J., dissents. DAVISON, J., concurs in conclusion.