Paul DUERSON and Marie Duerson, husband and wife, and Cecil R. Mitchell and J. Aline Mitchell, husband and wife, Plaintiffs-Appellees,

v.

Roger MILLS, Francis Mills, Letha Maxine Mills, Fern Angleton, B. R. Smylie, Overta L. Smylie, Iva Lauderdale and Vernie McLaughlin, Petitioners in Intervention-Appellees,

v.

AMOCO PRODUCTION COMPANY, a corporation, Defendant-Appellant,

v.

ANADARKO PRODUCTION COMPANY, a corporation, Pan Eastern Exploration Company, a corporation, and Exxon Corporation, a corporation, Third-Party Defendants-Appellants,

v.

Shirley BUSH, Dorla Dene Hedgpeth, Marie Ellen Williamson, and Veldo H. Brewer Company, a partnership, Third-Party Defendants-Appellees.

No. 54196.

Court of Appeals of Oklahoma, Division No. 2.

March 9, 1982.

Rehearing Denied May 19, 1982.

Certiorari Denied July 13, 1982.

Released for Publication by Order of the Court of Appeals July 16, 1982.

Timothy D. Leonard, Leonard, Trippet, Leonard & Kee, Beaver, for appellees-petitioners in intervention.

C. Harold Thweatt, Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Harry O. Hickman, Frank W. Wewerka, Denver, Colo., for appellants.

BOYDSTON, Presiding Judge.

Amoco appeals from judgment cancelling oil and gas leases. One well on the leasehold, drilled in 1958 to the Morrow formation, holds the 640 acre spacing unit by production. Production has dwindled since the early seventies.

Lessors filed suit on January 3, 1978, claiming nearby wells have been developed to the Chester formation and unless the Chester is developed on their leasehold, the gas under this spacing unit will be drained. Lessors asked the court to cancel their leases as to all formations *except* the Morrow, to award drainage damages caused by Amoco's failure to drill the Chester and to release all zones *except* the depleted Morrow.

In June, 1978, other royalty owners intervened and alleged all the leases within the spaced unit should be cancelled for failure to produce in paying quantities since 1975.

After the pleadings were made up, the controversy narrowed to the issue raised by Intervenors of whether the leases should be cancelled for failure to produce gas in paying quantities from the Morrow. Production from 1975 to June 1, 1978 is in dispute.

Amoco appeals the judgment cancelling the leases and raises the following issues:

(1) Whether administrative overhead costs should be charged against the operating expense account;

(2) For purposes of calculating whether a well is producing in "paying quantities,"

whether nonrecurring capital expenditures for lifting equipment (as opposed to repair) should be charged against operating expenses or amortized over the life of the component;

(3) Whether post-suit production performance is relevant in a suit to cancel leases on grounds of lack of production in paying quantities; and

(4) Whether the judgment is against the weight of evidence.

## I

■ Trial court ruled administrative overhead costs should be included in the operating expense account. This ruling is critical in determining whether the well is producing in paying quantities. Since the case was tried, the supreme court has ruled such expenses are "too indirectly and too remotely related to lifting costs" to be properly charged against net revenue. *Mason v. Ladd Petroleum Corp.*, Okl., 630 P.2d 1283 (1981). Accordingly we adjust the accounting to delete the district overhead expenses from consideration.

## II

■ Trial court based part of its judgment on production which occurred during 1978, after suit was filed. Amoco argues the filing of the action puts its title at issue and all its duties under the lease are suspended until the litigation is terminated. *Jones v. Moore*, Okl., 338 P.2d 872 (1959).

The language in *Jones, supra*, does appear to embrace this concept. However, we find a factual distinction and decline to give *Jones* such an overbroad interpretation. We find the principle that all duties are suspended during litigation comes from cases which deal strictly with lessees who were sued while in the process of drilling or reworking a well.[1]

These cases present several compelling equitable reasons for temporarily suspending certain duties during the term of litigation. First, lessee should not be required to invest in drilling a well when his legal right to drill is in serious legal jeopardy. A contrary rule would inevitably lead to vexatious litigation and create a dilemma for the operator—should he continue drilling operations under the cloud of litigation which, if it went against him, would cost him the investment; or, on the other hand, should he wait on the outcome of the suit in which case the lease may be lost for sure by the mere passage of time while the litigation paces through court?

There is a substantial distinction where the lease rights involve a producing well. Such a suit presents no compelling circumstances to excuse any of the lease terms. On the contrary, if lessee's duty to produce is legally suspended, *pendente lite*, it logically follows he may not be compelled to produce at all. Such a corollary is unacceptable for two reasons: (1) cessation of a producer could harm, if not "kill" the well; and, (2) such a suit usually involves a marginal well. With rare exceptions, exact operation expense data is unknown—except to the producer—until suit is filed and discovery is employed. All the royalty owner knows is that production has drastically declined. For example, the total ⅛th royalty for this entire 640 acre unit was $7.24 in December, 1979.

The supreme court has held it requires a court order to cancel a lease. The law is equally clear that "production in paying quantities" is, by definition, production in quantities sufficient to yield a return, "however small, in excess of 'lifting expenses'." *Stewart v. Amerada Hess Corp.*, Okl., 604 P.2d 854 (1979). The rule argued by Amoco would unfairly create a "safe zone" of nonproduction during what is, as a

---

1. *Jones, supra*, is an action to enjoin drilling and cancel lease in a dispute over whether drilling commenced within primary term. *Gibson & Jennings, Inc. v. Amos Drilling Co.*, 196 Okl. 143, 162 P.2d 1002 (1945), raises similar factual issues, as does *Hudspeth v. Schmelzer*, 182 Okl. 416, 77 P.2d 1123 (1938).

practical matter, mandatory litigation. It would encourage lease speculation by an operator who knows exactly what the all-important expenses are, "however large or small," to the detriment of royalty owners. It unfairly gives the producer the advantage of litigation time during which he need not show any return at all. Then, when the litigation is terminated in favor of lessees after years of litigation, including appeals, though the lease may have long since ceased to produce at all, lessee would have 120 days (the cessation of production re-work clause period in most cases) to commence another well.

Allowing the duties of performance to be suspended during litigation would penalize the royalty owner who files suit and reward the producer who is unfairly blocking production of other potential pay zones by artfully operating a dying well. Moreover, such a rule serves no useful or legitimate purpose for either side. Neither side should be given any particular advantage in a suit such as this. The sole issue is whether the well in question has ceased to produce in paying quantities. Production during litigation is probably more pertinent than pre-litigation production, because that is the essence of the litigation. And, as time passes, the more recent the evidence of production, including current market conditions, the more fairly and accurately the court can adjudge the equities.

In this case, there is another compelling reason for including postsuit production evidence. The trial court held title to the Morrow sand was not under attack until June, 1978. Initially, the suit asked only to cancel the leases to all *unproduced zones* and made no direct attack on the Morrow production. The issue whether the Morrow was producing in paying quantities was not raised until Intervenors pled their case in June, 1978. We agree with the trial judge's decision to permit the proof to include production data up to May 31, 1978.

### III

■ Amoco presented evidence it spent more than $6,200 in August, 1977, installing a new McLean swabbing tool to replace a similar, less efficient worn-out tool. Testimony was that it failed to increase production, but Amoco argued the McLean tool does not require venting gas and its use decreases the risk of "killing" the well. More important, the new tool will last the life of the well. The issue is whether all of the $6,200 expenditure is properly chargeable against 1977 operating expenses. If it is, its inclusion as an ordinary expense creates a $4,000 loss for 1977.

Amoco distinguishes between routine *repair* of the lifting system and *replacement* of major system components which ordinarily last the life of the well. The tool was installed in an attempt to increase production and replaced a component which is part of the original lifting system. Under the holding of *Stewart, supra,* repair of the lifting system falls within operation expenses and should be charged against net revenue to determine whether the well is producing in "paying quantities."

We recognize the validity of this argument, especially during the shank of production while reserves are plentiful. It would be unrealistic and counterproductive to charge major component replacement of original equipment to the month or even the year of installation without spreading the cost impact over the average useful life of the component, because it could lead to an illusory conclusion that the well is technically a nonproducer though ample reserves remain.

Replacement of major pre-production lifting components, which ordinarily last the life of the well, materially enhances the life expectancy of the well and therefore encourages production and conservation. This would be true whether the replacement is caused by a catastrophic failure or by reason of technological improvements which enhance and increase the well's profits.

We would apply the "prudent operator rule" and leave the determination—whether the expense of replacing lifting equipment should be spread over the life of the

well or taken all at one time—to the trial court's judgment based on the proof presented and taking into account all the evidence, especially the age of the well, the proven recoverable reserves and other pertinent evidence having a bearing on whether the well is capable of producing in paying quantities. *Henry v. Clay*, Okl., 274 P.2d 545 (1954).

In all cases, the court should be satisfied the expense in question is not a maintenance item but clearly a replacement of original lifting equipment occasioned by catastrophic failure or justified by improved production technology. Moreover, it must be factually justified by the technical and economic proof, having due regard for the remaining recoverable reserves and reasonable market expectations.

■ In this case Amoco suggests the cost of the tool should be spread over a ten year period. We agree and have adjusted the accounting by adding $31.36 to the operating account for the months following August, 1977.[2]

### IV

Trial court rejected evidence of depreciation of the lifting equipment. Since the judgment, the supreme court has spoken to this issue in *Stewart, supra*, wherein it held such expenses are a proper set-off against net revenue to determine net profit. Amoco argues even though trial court may have erred, we may not consider these sums on appeal for lack of a cross-appeal.

■ We find an accurate accounting is impossible without consideration of depreciation and we may properly consider the evidence where, as here, it has been preserved in the record and is offered to sustain a judgment in the party's favor. *Short v. Guy Nall Trucking Co.*, Okl., 442 P.2d 497

(1968); *Gilchrist v. Lowry*, 195 Okl. 537, 159 P.2d 261 (1945); and, *Hawkins v. Ferguson*, 131 Okl. 277, 268 P. 727 (1928).

After adjusting the accounts to delete administrative overhead and prorating the cost of the McLean tool over the next ten years, by adding $31.36 to the succeeding month's operating expenses, it is clear the well failed to produce in paying quantities for the entire five month period from January to May 31, 1978. *Hoyt v. Continental Oil Co.*, Okl., 606 P.2d 560 (1980), holds when production falls below paying quantities, lessee must restore paying production within the grace period (in this case 120 days) or forfeit the lease.

We have reviewed the record and find the trial court did not abuse its discretion by cancelling the lease.

Judgment of the trial court is affirmed.

BACON and BRIGHTMIRE, JJ., concur.

---

**2.** For simplicity, we have used Amoco's accounting exhibits to compute net production without regard to other co-worker's interest because all profits and loss are pro rata; therefore, resulting profits and losses are relative.

For example, though the entire cost of the tool exceeds $6,200, Amoco's pro rata cost is $3,763.48. To arrive at the amortized expense, we simply divided its cost by 120 months.