TEXAS CONSOLIDATED OILS et al.
v. VANN et al.

No. 35265.   March 24, 1953.

Rehearing Denied June 23, 1953.

*258 P. 2d 679.*

674

Jim Hatcher and Reford Bond, Jr., Chickasha, and C. J. Davenport, Sapulpa, for plaintiffs in error.

Clarence McElroy and Owen Vaughn, Chickasha, for defendants in error.

O'NEAL, J. The question before us arises in a proceeding by the owners of an 80-acre tract of land in Caddo county, to obtain a cancellation of an oil and gas lease executed by them and by assignment held by the operators, upon plaintiffs' contention that the operators have abandoned the lease and have failed to develop the same by drilling additional wells, thereby breaching the implied covenants thereof, and have failed to protect the land from oil and gas drainage from wells drilled on adjacent lands. For the reasons hereinafter stated, we hold that the court's decree and judgment requiring the drilling of additional wells in the manner and mode designated in the decree, and declaring a forfeiture of the oil and gas lease, cannot be sustained.

Plaintiffs' original petition filed November, 1948, alleges plaintiffs' ownership of the land and mineral rights in and to the S½ of the NW¼ of section 4, township 5 north, range 9 west, Caddo county, Oklahoma. That on June 27, 1941, plaintiffs, Wade H. Vann and Mary B. Vann, executed an oil and gas lease upon said land for a term of four months and as long thereafter as oil or gas was produced therefrom. By assignments the oil and gas lease is presently owned by the defendants, Texas Consolidated Oils, successor to Texmass Petroleum Company, and the Caddo Oil Company, the operators, and by certain other named defendants asserted to have an interest therein. That the operators have made no effort to develop said land under the lease, and have abandoned its development, with the exception of one well thereon. Plaintiffs state that there is considerable production of oil and gas on adjacent land, which proves all of the above described land is productive of oil and gas from other and different horizons and sands that warrants development of the undeveloped portion of said lease, which defendants have failed and refused to do. That defendants have failed to protect the land from drainage by offset wells. Written notice for additional development is pleaded. The prayer seeks a cancellation of all acreage under the lease, except the ten acres upon which the well is presently producing gas, for the reason that the operators have neglected to comply with the express and implied terms of

the lease, and have abandoned further development thereof.

On the 17th day of August, 1949, the plaintiffs filed their amended petition in which additional parties are made defendants, and who appear to claim some interest in the property involved, which rights are asserted to be inferior to plaintiffs' rights pleaded in their original petition.

On the 30th day of August, 1950, plaintiffs filed their amendment to their original and amended petition in which they allege that since the filing of their original and amended petition, there has been further development in the vicinity of the leased premises, and that the wells so drilled are direct off-sets to said land and cause plaintiffs' land to be drained of the oil and gas therefrom. Upon this additional ground, plaintiffs pray for cancellation of the lease.

The Texas Consolidated Oils, by its answer, states the defense of all named defendants necessary for our consideration. Defendant, Texas Consolidated Oils, after its general denial, admits its ownership of the oil and gas lease upon the described land and asserts that the notice for additional development is insufficient to advise defendants of planitiffs' ground for cancellation of the lease, and further that the notice served on defendants is not signed by the owners of the mineral interest in said land. The answer further states that at the time suit was filed there was no producing oil or gas well offsetting defendant Texas Consolidated Oils' lease and, therefore, there was no drainage of oil or gas from the land and, consequently, no cause of action for cancellation under the implied covenants of the lease to protect against drainage had accrued, when the notice for additional development was served on defendants.

Defendants pleaded that they have made considerable research at considerable expense to determine the potentialities of the lease for further development. That when said research is completed, if favorable, defendants intend to explore the deeper oil and gas sands underlying the land. Defendants specifically deny that they have or intend to abandon the lease, but on the contrary expect to develop it further if its geological research justifies additional development. Various defendants have filed separate answers and cross-petitions, but it will be unnecessary to refer to them for a proper disposition of the case.

The Texas Consolidated Oils and the Caddo Oil Company demurred to the sufficiency of the plaintiffs' evidence, which demurrer was overruled, and at the close of the trial demurred to the evidence and requested a dismissal of the plaintiffs' action for failure to establish facts upon which plaintiffs were entitled to any affirmative relief. The demurrer was overruled and from an order denying defendants a new trial, they have perfected their appeal.

A proper consideration of the issues involved require an examination of the court's decree and the judgment rendered thereon. The journal entry of judgment recites that there is a producing gas well on the SW¼ of the SW¼ of the NW¼ of section 4, and as to said gas well and to its ten acres of land the lease is confirmed and remains in full force and effect. As to the remaining 30 acres in the SW¼ of the NW¼ of said section 4, the decree provides that the NE¼ of the SW¼ of the NW¼ and the NW¼ of the SW¼ of the NW¼ and the SE¼ of the SW¼ of the NW¼ of said section 4, that the lease remain in full force and effect providing that the operators commence operations for the drilling of a well on one of said ten acres of land within 30 days from May 11, 1951, and prosecute such operations with due diligence until the well has been completed, and that within 30 days from the completion of the first well, that said operators commence drilling operations on the second well on another ten acres of said land and prosecute such operations

with due diligence until the well has been completed, and within 30 days after the completion of the second well that said operators commence drilling operations on the remaining ten acres of said 30 acres of land and prosecute such operations with due diligence until said last well has been completed; that if operators fail to drill any one of said wells within the time provided for in the decree, then the oil and gas leases on the said remaining ten acres of land will be canceled. As to that portion of the land described as the SE¼ of the NW¼ of said section 4, the decree cancels the oil and gas lease as to the defendants, Texas Consolidated Oils and Caddo Oil Company, on the ground that defendants have breached the implied covenants of said lease, and have abandoned said oil and gas lease, except that certain named individual defendants by reason of their reserved reassignment rights under the lease, which are established under the decree, are required to drill one well on each of the four ten-acre tracts in the SE¼ of the NW¼ of said section 4, within the same time and manner as provided for in the drilling of wells covering the SW¼ of the NW¼ of said section 4, by the operators, provided, however, that if the case is appealed the individual defendants shall not be compelled to perform on any portion of the land which they are prevented from performing by reason of said appeal until 30 days after the effective day of the final judgment. The decree finally provides that if the operators fail to drill any one or more of the wells on the remaining 30-acre tract in the SW¼ of the NW¼ of said section 4, then said named individual defendants shall have a period of 30 days, after the performance date on the part of the operators, to drill each ten-acre tract within the time and manner as heretofore specified in the decree.

The court reserved jurisdiction for the purpose of enforcing the provisions of the decree. Plaintiffs in error, Texas Consolidated Oils and Caddo Oil Company, being sole appellants, will hereafter be referred to as defendants, or operators.

Defendants seek a reversal of the decree and judgment on the following grounds:

(a) That the plaintiffs' petition, together with its amendments and the proof in support thereof, did not entitle plaintiffs to the relief prayed for.

(b) That the court erred in overruling defendants' demurrer to plaintiffs' evidence, and erred in overruling defendants' demurrer and motion for judgment at the conclusion of the trial.

(c) That the notice and demand served on defendants by plantiffs did not allow defendants sufficient time, prior to the filing of the action, to consider the demands made and reach an intelligent conclusion thereon.

A summary of plaintiffs' petition, together with its amendments, discloses that plaintiffs' claim for cancellation of the lease is based on the assertion that defendants have not complied with the express or implied covenants of the lease in fully developing the same for oil and gas production; that the defendants have failed to drill offset wells to prevent drainage of oil or gas from plaintiffs' land, and that defendants have wholly abandoned any intention for further development of the lease. On these grounds plaintiffs assert they are entitled to a cancellation of the entire lease, except a producing gas well and a ten-acre tract surrounding the well.

In support of the foregoing allegations plaintiffs produced proof that in June, 1941, plaintiffs executed the oil and gas lease upon the 80-acre tract described as the S½ of the NW¼ of section 4, township 5 north, range 9 west in Caddo county, Oklahoma, and that the defendants, Texas Consolidated Oils and Caddo Oil Company, acquired the lease by assignment and are the operators thereof. That during the initial term

of the lease the then lessees drilled a well to the total depth of 6,978 feet upon the SW¼ of the SW¼ of the NW¼ of said section 4, and that this well has produced gas in paying quantities at all times prior to the institution of the present action. As we have indicated, the trial court confirmed the lease insofar as it affected the producing gas well and the ten-acre location thereof.

Wade H. Vann, one of the plaintiff lessors, testified that he had a conversation with a field superintendent of the operators in which he requested that the operators further develop the properties by drilling additional wells. The superintendent advised Mr. Vann that the matter would have to be taken up with headquarters. Plaintiff stated that he did not further request additional drilling prior to the filing of his action, other than a written notice prepared by his attorneys and served upon the operators and other defendants in the action.

Harry Suffield, a petroleum geologist, testified that he prepared a map which shows the location of wells indicated by the letters "A to H" inclusive. The well designated by the letter "D" is the gas well on plaintiffs' land. Wells "B", "C", "E", "F", "G" and "H" were wells drilled on adjoining land subsequent to the service of notice for additional drilling, and subsequent to the filing of the present action. Well "A" ran its first production of oil in October, 1948, and the present suit was filed on November 10, 1948. The gas well in the southwest corner of the land is being produced from the Culp-Melton sand at a depth of 6,978 feet. There are a number of sands above the Culp-Melton, the first one encountered is the Fortuna sand zone around 2,100 to 2,500 feet in depth. Between the Fortuna and the Culp-Melton is found the Noble-Olsen sand at an approximate depth of 3,440 feet. That Fortuna and Noble-Olsen sands are present in Vann #1, which is a well located on land adjacent to the lease here involved. That the Fortuna and Noble-Olsen sands extend over the entire 80-acre tract of plaintiffs' land. That, in his opinion, if the Fortuna and Noble-Olsen sands were penetrated on any part of the 80-acre tract there would be a very good chance of obtaining production. Mr. Suffield testified that the Stanolind Oil Company had drilled a well on an adjacent tract to a depth of 7,490 feet, but the well was thereafter completed in the Fortuna sand, and from this information he gave it as his opinion that there are deeper sands that have a pretty good chance of production; that these sands might be encountered in the Hunton limestone at 10,000 feet and in the Simpson series ranging from 12,000 to 14,000 feet estimated depth, and that lower sands than these may be present though no well has been drilled lower than the Stanolind well referred to. The witness states that, in his opinion, the wells designated "A", "B", "C", "E", "F", "G" and "H" located on adjacent lands, all drain the 80-acre tract in question. The record is not clear, but the inference is that the witness limited his drainage to oil. Referring to Well "C", he stated that this well drained plaintiffs' land. Referring to Well "G", he stated: "I would say it possibly would drain plaintiffs' land." As to Well "A" the witness stated: "It probably drains plaintiffs' land. I think it probably does."

As to the Stanolind-Thatcher well designated as Well "F", the witness stated: "It will drain some oil and gas." As to Well "B" the witness stated: "It could have some drainage from the northwest portion of the plaintiffs' land." The witness did not state his opinion as to whether or not Wells "E" or "H" would drain plaintiffs' land.

John S. Graham, a drilling contractor, testified that a well completed and equipped to the Noble-Olsen would cost approximately $30,000, and to the Fortuna approximately $20,000, and at a cost of $35,000 to complete a well to both sands; that the approximate cost of operation of a well in the field was

$1,000 yearly; that as a drilling contractor and as a producer of oil in comparable formations, he would require four or five months time to observe a well's production record before determining whether or not additional drilling operations would be warranted.

Upon the foregoing record, the court overruled defendants' demurrer to plaintiffs' evidence.

Defendants' evidence substantially discloses that the gas well, Well "D" on plaintiffs' land, was drilled at a cost of $56,000, and that since defendants' acquisition of the lease the well has produced $21,897.78 in revenue over and above operating costs; that the well will successfully drain all gas from the plaintiffs' land, after which the well could be completed in the Fortuna as an oil well.

Defendants' evidence corroborates plaintiffs that an operator would require from five to seven months production experience before a petroleum engineer could give a sound opinion as to the advisability of drilling offset wells in the area.

At the trial in March, 1951, the operating defendants made an offer to drill a well as a diagonal offset to Well "A" located on adjoining land, and drill the same to the Fortuna or Noble-Olsen formation, which offer was declined by plaintiffs and was again renewed as shown by the testimony of the operating defendants. As applied to Well "A" the proof shows that the well was not completed on September 9, 1948, the date upon which the notice for additional drilling was served upon the operators. The first production from that well was obtained in October, 1948, and its total production to December 31, 1950, was 10,113.47 barrels.

Mr. W. C. Bednar, a petroleum engineer, called by the defendants, testified that the Cement field in which the plaintiffs' lease is situated, was discovered in 1917, and that over 700 wells have been drilled in the field. These wells were drilled at depths of 2,000 feet to 10,776 feet. One well in the North Cement field was drilled to a depth of 13,046 feet. The Fortuna zone sand at 2,300 feet is interbedded with shales and thick individual sand members ranging from very thin to at times as much as 12 feet in thickness. The sands in the Noble-Olsen zone at 3,400 feet are lenticular and interbedded with shales. That in the Noble-Olsen zone additional sand members can be expected to have a thickness up to as much as 18 or 20 feet. Wells "A" and "B" located north and northwest on adjacent land will produce oil in paying quantities, and he so advised the operators in February, 1949, following the completion of Well "A" in October, 1948. The well was not drilled because of the filing of the present action. That the Fortuna under defendants' gas well has sufficient sand thickness to warrant completing an oil well in that zone when the gas well is abandoned. That from his interpretation of the electric log he concludes that the Noble-Olsen sand is not present under the entire 80-acre tract, as indicated by the witnesses' isopachous map, showing the absence of net pay sand in that sand zone.

A summary of the testimony, both of the plaintiffs and defendants, establishes that when the action was filed only one well had been drilled on adjacent land, to wit: Well "A", and its first production, was received in October, 1948, and the plaintiffs' action was filed in November, 1948. Well "B" located on adjoining land made its first runs in September, 1949, and the cumulative runs from this well and a companion well ran to the same batteries as of January 1, 1951, was 13,024.34 barrels. Well "C" located on adjoining land made its first runs in March, 1949, and its cumulative production as of January 1, 1951, was 11,318.28 barrels. Well "E" located in section 5 on adjoining land had its first pipe line run as of November, 1948, and

its cumulative production as of January 1, 1951, was 2,912.37 barrels.

That a well known as the McKenna well, located south and east of plaintiff's land, and which was drilled both to the Fortuna and Noble-Olsen sands, was a dry hole. Well "F" on the same McKenna tract, and which was completed in October, 1948, in the Fortuna, will not produce oil economically. Well "G" located on land southeast of plaintiffs' tract known as the Norman-Graham well, was completed in February, 1950, and as of January 1, 1951, had a cumulative production of 4,813 barrels. Well "H" located east of Well "G", referred to above, was completed in November, 1948, and its ultimate recovery over a period of eight years will not exceed 16,424 barrels. The testimony of the officers of the operating companies disclosed no intention to abandon the lease in whole or in part, and as heretofore indicated, they offered to drill a well offsetting Wells "A" and "B" prior to and at the trial, and there is no question as to their financial ability to assume the obligation of further drilling development of the lease.

Plaintiffs' assertion in their brief that adjoining wells in the area were draining the land is not sustained by the record. In our view of the record, the plaintiffs wholly failed to sustain the allegations of their petition by competent evidence, and the defendants' demurrer at the close of all of the evidence should have been sustained. As we have noted, plaintiffs' allegations went no further than a statement that defendants made no effort to develop the lease. No facts were alleged upon which the allegations are predicated, neither are any facts alleged or established upon which plaintiffs could base their contention of abandonment, nor is there any proof sustaining plaintiffs' allegations that their land is being drained by wells drilled on adjoining land.

After the service of notice for additional development was served by the lessor, the obligation of the lessee to develop further under said lease is suspended until the settlement of the controversy. Gibson & Jennings, Inc., v. Amos Drilling Co., 196 Okla. 143, 162 P. 2d 1002.

In Magnolia Petroleum Co. v. St. Louis-S. F. R. Co., 194 Okla. 435, 152 P. 2d 367, we held:

"The burden rests upon a plaintiff seeking cancellation of the undeveloped portion of an oil and gas lease on the theory of breach of covenant to plead and prove the facts establishing breach of covenant."

Plaintiffs' proof in support of their claim for cancellation of the lease went no further than the statements of the witness geologist that the Fortuna and Noble-Olsen sands were present under the entire 80-acre lease involved, and would be productive wherever encountered on any portion of the lease, and his further statement that wells drilled on adjoining lands produced oil and, in his judgment, probably drained plaintiffs' land. Plaintiffs made no attempt to establish that any well drilled on the 80-acre tract, or that the wells drilled on adjoining land, would produce oil and gas in paying quantities. There is substantial evidence to the contrary. The lease in question provides:

"That it shall remain in full force and effect for four months, and as long thereafter as oil and gas, or either of them, is produced from said land by the lessee."

In Walden v. Potts, 194 Okla. 453, 152 P. 2d 923, we said:

"A clause in an oil and gas lease that the lease shall continue for one year 'and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee in paying quantities' means not only discovery but taking out oil or gas in pursuance of the covenants and purposes of the lease in such quantities as will pay a profit to the lessee over the operating expenses."

In the present case it is without dispute that Well "D", the gas well, has

at all times produced gas sold from the premises in paying quantities.

In Wilcox v. Ryndak, 174 Okla. 24, 49 P. 2d 733, we said:

"There is no implied obligation on the part of an oil and gas lessee to drill an offset well to a well on adjoining premises, or to drill an additional well on the leased premises after oil or gas has been discovered thereon, save and except where the drilling of such well would probably, taking all of the existing facts and circumstances into consideration, produce sufficient oil to repay the cost of drilling, equipping and operating such well, and also to produce a reasonable profit on the entire outlay, and neither the lessee nor the lessor is the arbiter of whether an offset well should be drilled or the leased premises further developed, but both are bound by what a reasonably prudent operator would do under similar circumstances, and under no circumstances will a lessee be required to drill an offset or an additional well when the same would probably not result profitably to him."

In Ramsey Petroleum Corporation v. Davis et al., 184 Okla. 155, 85 P. 2d 427, we held:

"The test prevailing in this state for determining a breach of the implied covenants to drill additional wells and to protect the lease premises from drainage by wells on adjoining lands is 'the ordinary prudent operator test'. It requires the lessee to do whatever in the circumstances would be reasonably expected of operators of ordinary prudence, having regard to the interest of both lessor and lessee, but neither is the arbiter of the extent to which, or the diligence with which, the operations shall proceed. The burden of proving the breach of these implied covenants is upon the plaintiff."

Plaintiffs' contention that defendants abandoned the lease cannot be sustained for we have held that nondevelopment of a portion of a lease, unaccompanied by physical relinquishment, is not sufficient to constitute abandonment, Doss Oil Royalty Co. v. Texas Company, 192 Okla. 359, 137 P.

2d 934, and Gibson & Jennings, Inc., v. Amos Drilling Co., 196 Okla. 143, 162 P. 2d 1002. In the latter case, we said:

"Nondevelopment of a portion of a lease, unaccompanied by physical relinquishment, is not sufficient to constitute abandonment."

The same rule was announced by this court in Ferguson et al. v. Gulf Oil Corporation et al., 192 Okla. 355, 137 P. 2d 940, and Skelly Oil Co. v. Boles, 193 Okla. 308, 142 P. 2d 969.

In the instant case, it is shown that only seven years intervened from the drilling of the gas well producing in paying quantities, and the filing of the present suit for cancellation. Moreover, it is shown that defendants offered to drill an offset well to Well "A" located on adjoining land and were also negotiating for a deep test well, and it is without controversy that both lessor and lessee are of the opinion that a deep test, either to the Simpson, Wilcox or Ordovician, has distinct possibilities of paying production.

This court has uniformly held that neither the lessor nor lessee was the arbiter as to whether due diligence had been exercised in operating and developing an oil and gas lease, and that whether such due diligence had been exercised depends upon the facts and circumstances of the case. Strange et al. v. Hicks et al., 78 Okla. 1, 188 P. 347; Pelham Petroleum Co. v. North, 78 Okla. 39, 188 P. 1069.

As to whether the court should in any given case declare a forfeiture of the undeveloped portion of a lease must be determined by the facts established in each individual case. Skelly Oil Co. et al. v. Boles et al., 193 Okla. 308, 142 P. 2d 969.

The trial court was not advised by plaintiffs' evidence whether a well on any portion of the lease would produce oil and gas in paying quantities, save and except all parties agreed that an offset well to Well "A" would, in all probability, produce oil in paying quan-

tities, both in the Fortuna and the No-ble-Olsen. But as we have heretofore stated, lessor refused to let lessee drill the offset well. Neither was the court advised by plaintiffs' proof that additional wells as offsetting wells to Wells "B", "C", "F" and "G" would produce either oil or gas in paying quantities. Plaintiffs' geologist did not testify that either one of said wells would produce oil in paying quantities, but limited his statement to the effect that they would produce some oil. Likewise, he expressed the opinion that each of these wells would drain some oil from plaintiffs' land. Neither did plaintiffs' evidence establish facts as to the thickness of the sand formations, or whether they were porous and therefore permeable to the flow of oil or otherwise.

Forfeitures to be sustained must be supported by substantial facts as forfeitures are only granted to effectuate justice, Skelly Oil Co. v. Boles, supra.

We have reviewed the entire record and are of the opinion that the plaintiffs have not sustained, either by allegation or proof, that the lease was abandoned, or that the defendants have failed to comply with the implied covenants of the lease in its further development. Furthermore, that there is no proof sustaining plaintiffs' contention that the lease should be forfeited, in whole or in part, for failure to protect it against drainage from wells drilled on adjoining land.

Counsel for plaintiff relies strongly upon Doss Oil Royalty Co. v. Texas Company, 192 Okla. 359, 137 P. 2d 934, McKenna v. Nichols, 193 Okla. 526, 145 P. 2d 957, and Colpitt v. Tull, 204 Okla. 289, 228 P. 2d 1000, in support of the judgment rendered. As we read the cases they announce the rule that:

"A suit for cancellation of the undeveloped portion of a producing oil and gas lease is of equitable cognizance, and is governed by principles of equity."

It is pointed out in each cited case that:

"the granting of such relief depends upon the facts and circumstances surrounding the particular case."

Neither do the cases depart from our oft-expressed pronouncements that neither the lessor nor the lessee is the arbiter of the extent to which, or the diligence with which, the lessee shall proceed, but such question is committed to the sound discretion of the court to be determined from the facts and circumstances of each case.

In the Doss case, we find the lessee had failed to drill additional wells on a large portion of the lease for a period of fourteen years, and the question was posed as to whether the court might grant relief without requiring the lessor to prove that such additional wells may be drilled with a reasonable expectation of profit as required by the prudent operator rule, under the theory of a breach of the implied covenants of the lease.

This court held that:

"In an action to cancel the undeveloped portions of producing oil and gas leases after the expiration of the primary term, evidence that the operator has failed for an unreasonable length of time to develop substantial portions thereof is sufficient to withstand defendant's demurrer to the evidence."

We construe our holding not to abrogate the prudent operator rule for we, in the opinion, stated:

"The prudent operator rule may be considered as a measuring stick to guide the court in determining the diligence required of the lessee in order to ascertain whether a breach of the implied covenants has occurred."

Like other rules of equity, the prudent operator rule is not inflexible. That this is a rationale of the case is demonstrated by our decision in McKenna v. Nichlos, supra. The same Justice prepared both opinions of the court. In that case the opinion states:

"But the duty to drill further wells, after the lapse of an unreasonable length of time, is not tested by the standard of the prudent operator alone. In the recent case of Doss Oil Royalty Co. v. Texas Co., 192 Okla. 359, 137 P. 2d 934, we had occasion to treat this subject extensively, and the principles there laid down govern the instant case. In that case we pointed out that suits for the cancellation of oil and gas leases are governed by principles of equity, and that the question of whether a lessee has breached the implied covenant for further development is committed to the sound discretion of the courts, to be determined from the facts and circumstances of each case. We stated that while, in determining such matter, we would consider the question of the likelihood of profit from further drilling, we would also give weight to other considerations, particularly the length of time which the lessee had held the lease without further development. In other words, after the passage of a reasonable length of time, the duty to drill additional wells becomes progressively greater, and the standard of the prudent operator becomes progressively of less importance in determining whether such duty exists."

In Colpitt v. Tull, supra, our decision is based upon our holding in the Doss and McKenna cases. Specifically, we said:

"Therefore, when there is an unreasonable delay in drilling additional wells plaintiff is not required to prove that additional wells would have been profitable."

The rationale of the cases leads us to the following conclusion: (1) Where in the Doss, McKenna, and Colpitt cases the additional development is long delayed, a court of equity may, in a proper case, declare that the implied covenants of the lease for reasonable development have been breached and upon such finding cancel the undeveloped portion thereof. The decree is sustained by proof of mere lapse of time without more. (2) Where from all facts and circumstances the delay in the additional development is not long delayed, but additional development is demanded by the lessor, the reasonable operator rule will apply. Neither the lessor nor lessee is the arbiter of its application. The rule of law which this and other courts have uniformly followed is that the lessor must establish the fact that additional development in all reasonable probability will result in profit to the lessee, over and above the costs of the development.

This construction avoids an antinomy between principles of equity and rules of law, for our decisions disclose that the principles of equity, and the rule of law, applicable to cancellation of oil and gas leases, as to the undeveloped portion thereof, are coexistent and run parallel.

We cannot agree with defendants' contention that such interpretation will result in an inequitable disposition of the case; nor will we indulge in the presumption that the equitable power of the trial court may be improperly exercised. A court of equity does not have unbridled authority under the guise of justice and equity to substitute its judgment in opposition to the law. Equity follows the law.

In York v. Trigg, 87 Okla. 214, 209 P. 417, we said:

"No court is ever justified in invoking the maxim of equity for the purpose of destroying legal rights or of establishing rights that do not exist."

Nor do we agree with a contention made that this disposition of the case permits the trial judge to decide for himself what he thinks is just and equitable, uncontrolled and unrestricted by any norm, standard or yardstick.

As we have attempted to point out, the measuring rod is the rule of law which guides the chancellor to a just and equitable solution.

The decree commands lessee to commence a well on a 10-acre tract and within 30 days after its completion commence a second well on a 10-acre tract, and upon its completion, and

within 30 days, drill a well on the third 10-acre tract.

It then provides that if lessee does not drill on the first tract, as commanded, the lease is canceled on the entire 30 acres. If, however, he drills the first tract, and fails to drill on second tract, the remaining 20 acres are canceled; if he drills on the second tract and fails to drill on the third tract the remaining 10 acres is canceled.

This decree is unreasonable, inequitable and unjust. It does not take into consideration whether the drilling of any one of such wells comes in as a dry hole, or whether it will reasonably produce oil or gas in paying quantities. Under the reasonable operator rule a lessee has never been required to drill additional wells, in the absence of a showing the well would be profitable to both lessor and lessee.

The decree also canceled the remaining 40 acres of the east half of the 80-acre tract, as of the date of the judgment.

The same vice is imbedded in the decree as it affects certain individual defendants, having reserved assignable rights under the lease as it affects the east 40-acre tract.

The judgment of the trial court is reversed.

HALLEY, C.J., JOHNSON, V.C.J., and CORN and WILLIAMS, JJ., concur. BLACKBIRD, J., dissents.