SHELL OIL CO. et al. v. LEE et al.
No. 35233.

Supreme Court of Oklahoma.
April 21, 1953.

Rehearing Denied May 12, 1953.

Application for Leave to File Second Petition for Rehearing Denied July 14, 1953.

Hugh McGill, Ardmore, Charles L. Follansbee, Geo. W. Cunningham, Robert M. Hart, Gordon Watts and Jesse M. Davis, Tulsa, for plaintiffs in error.

H. A. Ledbetter, Ardmore, for defendants in error.

BLACKBIRD, Justice.

Defendants in error and plaintiffs in error will hereinafter be referred to as "plaintiffs" and "defendants" as they appeared in the trial court, except when designated by particular name; and, in this connection, for brevity, only the first word in the oil companies' names will be used.

The lease, for the cancellation of a portion of which, plaintiffs brought this action, was originally executed and delivered by plaintiffs' predecessors in title, one Koski and wife, to a lessee named Staiti in 1913. It covered 120 acres, (in what is designated on a map in evidence as the Whiskey Creek, Wheeler Extension of the Old Healdton Field in Carter County, Oklahoma), described as: The West Half of the Southwest Quarter and the Northeast Quarter of of the Southwest Quarter of Section 32, Township 3 South, Range 3 West. In 1914, Staiti assigned an undivided one-half interest in the original lease to the defendant, Houston-Oklahoma Company, and by mesne assignments, the defendants Gulf and Shell each became the owners of an undivided one-fourth interest in the lease, during the years 1936 and 1939, respectively.

During the years 1914 and 1916, both inclusive, 14 wells had been drilled on the lease to the Healdton Sand, found there at various depths ranging from slightly less to slightly more than 1,000 feet. Four of these wells were on the 40-acre part of the leased acreage acquired in 1914 and still owned by plaintiffs, described as: The Northeast Quarter of the Northeast Quarter of the Southwest Quarter, and the South Half of the Northeast Quarter of the Southwest Quarter, and the Northeast Quarter of the Southwest Quarter of the Southwest Quar-

ter. Of the 4 wells drilled on plaintiffs' 40 acres, the 2 on their 2 contiguous 10-acre tracts, comprising the South Half of the Northeast Quarter of the Southwest Quarter, were plugged. Out of the remaining 12 producers of the 14 wells drilled on the lease, this left only the 2 in the Northeast Quarter of the Southwest Quarter of the Southwest Quarter of said section, on plaintiffs' part of the leasehold.

In January, 1949, defendant Shell drilled a well in the northwest corner of the lease to a depth of 1182 feet, whose initial production was 23½ barrels of oil per day. Thereafter, it "farmed out" the shallow rights on the lease to one Charlie Dobbins and through this arrangement obtained the drilling of 2 additional wells in December, 1950. Both of these wells were located in the northwest corner of the leasehold and across a 10-acre tract from plaintiffs' part of the land included therein. One of the wells was completed at 1194 feet as a 12-barrel producer and the other made only one-fourth of a barrel per day at 1141 feet.

When this action was filed, plaintiffs' 10-acre tract in the extreme northeast corner of the quarter section, immediately north of the 2 plugged wells had never had a well drilled on it, but defendants, in conjunction with other operators in the area had undertaken a search for oil in its deeper horizons, where the existence of potential oil-bearing structures was indicated by an expensive seismic and geophysical survey of the township in which this lease was located. This survey was followed in 1949, by the drilling of a well known as the Shell-Bristow No. 1, at a location in Section 20, approximately 1 and ¾ths miles north of the lease involved here. This well was drilled to 11,953 feet, at a cost of $524,250.88 and had initial production of 119 barrels per day. Later the same year, by agreement with another operator, Shell participated in the expense of drilling a well designated as the "Burton" or "Burton-Neustadt" well, in the southwest corner of the same section only about ¾ths of a mile northwest of the lease involved here. That well was drilled to a depth of 6680 feet, but didn't produce any oil until Shell turned it over to the operator who had helped drill it. He drilled it a few feet

deeper and completed it for a 49-barrel per day producer. Shell next entered into an agreement for the drilling of a third well farther north in Section 29, (which adjoins Section 32 on the North). It has been designated as the "Shell-Neustadt" or "Shell-Finston-Neustadt" well and was located about one mile north of the lease in question. It was finally completed by Shell at a depth of 7670 feet in June, 1950, for a 99-barrel producer, with the first oil being run therefrom in July of that year.

Less than a month later, attorneys for plaintiffs joined in a letter to the defendants, Shell and Gulf, describing their part of the leased Section 32 land and demanding that a well be commenced on it "within fifteen (15) days after you shall have received this notice, and unless you do commence drilling and continue to drill the acreage described above, within fifteen (15) days of the date you receive this notice *and* unless you release of record the oil and gas lease held by you and covering the above described land within fifteen (15) days, a suit will be filed against you for damages and for cancellation of said oil and gas lease." (Emphasis ours.)

On July 25, 1950, the next day after it was received, this letter was answered by one from Mr. Austin of Shell's land department, acknowledging receipt of plaintiffs' written demand and stating that the matter was receiving attention and an attempt would be made "to give you a reply in the very near future."

Having had no further communication from Shell, Mr. Ledbetter, one of plaintiffs' attorneys, telephoned Mr. Austin at Tulsa about two weeks later and Mr. Austin then told him that Shell would drill a well to the Healdton Sand on plaintiffs' part of the lease. Notwithstanding this offer, plaintiffs started suit the next day against Shell and Gulf for cancellation of the lease in the District Court of Carter County. Upon learning of the filing of said action, Mr. Blakely, manager of Shell's Land Department, wrote Mr. Ledbetter August 22nd, 1950, calling his attention to said company's recent completion of the deep well in the Southwest Quarter of Section 29, about a mile from plaintiffs' land, and informing him that the com-

pany had agreed to support another deep test to be drilled in the North Half of Section 32, about a quarter of a mile from said land, and it wanted to observe the results of this very expensive test before attempting additional deep drilling, but that it could get an additional Healdton Sand well drilled on the lease involved here, if the suit was dismissed. On August 25th, Mr. Ledbetter answered Mr. Blakely's letter stating that he had taken up with his clients, Shell's request for dismissal of the suit, and they had advised him that said company's offer wasn't satisfactory "but they did state to me that they would consider an offer from you as an adjustment of this matter, if you would drill a deep test on this land, or in lieu thereof, they would consider *a monetary consideration* and the drilling of a well and the payment of the costs and reasonable attorneys' fees, and on this I will be glad to hear from you." (Emphasis ours.) Then followed additional correspondence between Mr. Ledbetter and Mr. Davis, attorney for Shell, which was not terminated until the early part of September, 1950, in the course of which Mr. Ledbetter revealed that his clients had had "a cash offer of $100.00 an acre for thirty-five acres of this land." In the meantime the State Court action plaintiffs had filed, was removed to the Federal Court, and, upon discovering that they had failed to make Houston-Oklahoma Oil Company a party defendant to that action, they obtained a provisional order of dismissal by the Federal Court in contemplation of including said company with the other defendants in the present action, which was then filed in the District Court of Carter County on December 20, 1950, the next day after the described dismissal in the Federal Court. It will thus be seen that there was litigation to obtain cancellation of this lease pending continuously from August 9, the 16th day after plaintiffs' initial demand for further drilling, until commencement of the present action.

When this case was finally tried, the court determined the issues in favor of the plaintiffs and rendered an alternative judgment cancelling the lease, as to the shallow sands, except as to the $E\frac{1}{2}$ of the $NE\frac{1}{4}$ of the $SW\frac{1}{4}$ of the $SW\frac{1}{4}$, unless the defendants

within 20 days filed with the court clerk an election to, and did commence drilling one well to a depth of 1500 feet within 60 days and cancelling it as to all undeveloped portions unless defendants so elected to, and did commence another well to a depth of 6500 feet on the lease within 6 months from the date of the judgment.

One of the questions raised by defendants in this appeal from said judgment is the same one found to be decisive in Cause No. 35232, entitled: Shell Oil Company, v. Howell, Okl.Sup., 258 P.2d 661, namely: Whether or not on the basis of the facts presented, plaintiffs were entitled to the conditional or alternative cancellation of the lease granted by the trial court's judgment. As the same principles and authorities used and followed in our opinion in that case apply here, they are hereby incorporated herein by reference without complete repetition. Here, as in Cause No. 35232, supra, there is no substantial basis for the inference that the defendants had abandoned the lease. They had not failed to drill for an unconscionable or unreasonable length of time, as was the case in Doss Oil Royalty Co. v. Texas Co., 192 Okl. 359, 137 P.2d 934. On the contrary, as hereinbefore indicated, the evidence shows that the defendant Shell had participated in drilling two shallow wells in 1949 and 1950, respectively, to the Healdton Sand, which, as far as the record shows, was the only producing horizon ever thought about in the area at the time the lease was executed. The last of these wells was not completed until the same month in which this action was commenced. In addition, said company had expended substantial sums of money in an effort to discover oil in paying quantities in deeper horizons in the vicinity of the lease; and the last of the deep wells it helped drill, was not completed until a little more than a month before plaintiffs commenced their litigation. All of the evidence supports the uncontradicted statement of Shell's geologist, Mr. Owens, to the effect that the discoveries in the deeper horizons in which his company had participated, were directly responsible for renewed interest in the area and an increase in the mineral value of plaintiffs' land.

Plaintiffs' counsel seem to rely as justification for cancelling the lease, upon a part of Mr. Owens' testimony in which he indicated that his company has no "present" intention of drilling a deep test on the leased premises. An examination of Mr. Owens' testimony as a whole, together with the other evidence, including the letter dated August 22, 1950, of said Company's Land Manager, Mr. Blakely, to attorney Ledbetter, shows, however, that the reason the company then had no such "present" intention, and was not then drilling a deep test on this lease, is that it had committed itself to helping drill one a quarter of a mile north of it and wanted to wait and see what was discovered therein before drilling such a well on this lease. In view of the evidence in the record tending to show the cost of such tests, we are not prepared to say that a prudent operator would have taken any different position. Nowhere in the record do we find proof that a reasonable and prudent operator would have undertaken a deep test on this particular land, which appears to be the principal thing (other than obtaining an additional "monetary consideration" out of the drilling or mineral rights on their land) in which plaintiffs were interested.

It is a matter of more or less common knowledge in oil producing sections of this country that practicable or feasible arrangements for such development, especially in the instance of exploration of a newly discovered deep structure or exploration in a "wildcat" area, often require much time; and what is a "reasonable" or "unreasonable" time for a lessee to delay further drilling in a particular case must depend on the facts established therein.

In this case, plaintiffs' brief mentions a claim that a pattern or design of drilling one well to each ten acres of the lease had been indicated by the previous drilling in Section 32. The apparent implication in this, is that it was defendants' duty to carry such design to its ultimate conclusion and drill on each and every ten-acre tract of the leasehold. As hereinbefore shown, the only ten acres belonging to plaintiffs that hadn't been drilled on, was the one in the extreme Northeast cor-

ner of the Southwest Quarter of said Section 32, which tract adjoins on the north the 20-acre tract upon which two wells had been drilled to the Healdton depth many years before. It will be remembered that these did not produce in commercial quantities and were plugged. If it was plaintiffs' belief or desire that a hole should have previously been drilled to explore the Healdton Sand on the undrilled ten acres, they should have proved that a prudent operator would have done so (by way of showing that defendants had breached the lease's implied covenant for further development), since they were unable to show a failure or refusal by defendants to drill on the lease for an unconscionable or unreasonable period and thereby justify its cancellation, under the applicable rules in such cases.

■ Consistent with the views expressed in Shell Oil Company v. Howell, supra, we think plaintiffs wholly failed to discharge their burden of showing cause for the extraordinary relief of cancellation or forfeiture of the lease, and that the trial court should have so concluded, and rendered judgment for the defendants. Its judgment to the contrary, is therefore hereby reversed and the cause is remanded to said court with directions to set it aside and render judgment for the defendants.

HALLEY, C. J., JOHNSON, V. C. J., and WELCH, CORN, DAVISON and WILLIAMS, JJ., concur.

O'NEAL, J., dissenting.