**UNION OIL COMPANY OF CALIFORNIA,**
Plaintiff in Error,

v.

**J. V. JACKSON, Defendant in Error.**
No. 43019.

Supreme Court of Oklahoma.

Oct. 19, 1971.

BERRY, Chief Justice:

This appeal presents questions involving correctness of a trial court judgment canceling part of a producing oil and gas lease for alleged failure of diligent development. Evidentiary matters mentioned sufficiently disclose circumstances upon which the action was based.

The Putnam Oswego Field in Dewey County produces oil and gas from a common source of supply identified as Oswego Lime. The defined field covers thirty-five miles southeast-northwest, and is from one and a half to four miles in width. The field contains 130 oil wells and 60 gas wells, all producing from the Oswego Lime formation, found at depth of approximately 9600 feet. Plaintiffs Jackson, as lessors, owned undivided interests in the northeast quarter of Section 21, Township 16 North, Range 17 West, and in the southeast quarter of Section 15, which offsets diagonally to the northeast. By appropriate orders of the Corporation Commission each section has been declared a single drilling and spacing unit both for Morrow Sand formation, and the Oswego Lime.

Plaintiff's undivided interests in both tracts were included in a single lease executed in 1951 and assigned to defendant, Union Oil Company of California, in 1959. This same year defendant drilled a well in Section 15 to the Morrow Sand at 11,851 feet which was unproductive and was plugged back and completed as an Oswego gas well. Although not located on their lease, plaintiffs have participated in production from the well in Section 15, which is within the unit. No well had been drilled in Section 21, and no drilling was contemplated when this action was tried.

Plaintiffs alleged defendant owed a duty of diligent development and to protect against drainage by adjacent offset wells; and, the primary lease term had expired December 19, 1961, since there had been no production. Despite both oral and written demand for the lease to be drilled or forfeited defendant had neglected and refused to act, and the lease should be canceled and forfeited.

Defendant answered admitting facts as to ownership of leasehold estate, participation in completion of a well in Section 15, and continuous production of oil and gas therefrom. Defendant denied failure to develop, abandonment, or breach of implied covenants, and alleged good faith diligence and compliance with terms of lease.

■ This is a case of equitable cognizance and this Court must examine the entire record and weigh the evidence to determine whether the judgment is against the clear weight of evidence, or contrary to law or established principles of equity. Sinclair Oil & Gas Co. v. Bishop, Okl., 441 P.2d 436. Issues advanced on appeal require examination in relation to clear

weight of the evidence, and also whether this judgment is violative of established principles of equity.

To support allegations of the petition, plaintiffs introduced the pretrial stipulation showing ownership of the separate tracts under the lease, each constituting a separate drilling and spacing unit. The stipulation also showed drilling and completion of the well in Section 15 during the primary term, continuous production thereafter and expiration of primary term December 13, 1961. Plaintiffs offered no other evidence, either as to failure to develop or possible drainage. Defendant's demurrer to the evidence was overruled.

Defendant's evidence bearing upon discovery, development and determination of the nature, size, and limits of the Oswego Lime field was uncontroverted. Defendant further showed the Oswego was the only known producing formation, this having been determined from exploration and development between 1958 and time of trial, within which period defendant drilled 21 Oswego Lime wells costing two and three quarter million dollars. These operations resulted in 7 gas wells, twelve oil wells and two dry holes.

Summation of evidence reflecting active participation in development within this area discloses defendant's consistent efforts and activities. In 1958 defendant drilled in Section 10 to test Morrow Formation (No. 1–10 Irvin) 7 miles from production. This well was a dry hole, but was completed as an Oswego gas well.

In 1959 the Coit well in Section 15 was drilled as a dry hole in the Morrow, but completed as an Oswego gas well. This same year defendant drilled the 1–20 Wilson to the Hunton Lime (14464 feet) in Section 20 which was abandoned as a dry hole. Thereafter defendant drilled the 1–25 Fortner to the Chester Lime in Section 25 at cost of $457,103.00, and abandoned this effort as a dry hole. Defendant also drilled No. 1–9 Robertson to the Oswego Lime in Section 9 which was completed as a gas well. Later defendant participated in drilling No. 1–King in Section 23, which was completed as an Oswego oil well. During 1959 defendant expended more than $1,800,000.00 in development and exploration.

In 1960 defendant drilled and completed No. 1–16 Jordan in Section 16 as an Oswego gas well. The No. 1–6 Sarkeys was drilled through the Oswego in Section 6 and abandoned as a dry hole. Number 1–14 Waddell was drilled in Section 14 and completed as an Oswego gas well, as was the No. 1–4 Lisle in Section 4. Four wells costing $481,900.00 were drilled with three Oswego completions for gas wells.

In 1961 the No. 1–11 Beers was drilled in Section 11 and completed as an Oswego gas well at cost of $135,600.00.

In 1962 defendant participated in extensive engineering feasibility studies of gas cycling operations as a means of enhancing field production. Within the year defendant either drilled, or participated in, nine wells in the field: gas wells were completed in Sections 5 and 8; six oil wells were completed in Sections 13, 23 and 25. All wells drilled were completed in the Oswego Lime, including a well in Section 24 which was a dry hole. Expenditures for drilling and completion of these wells totaled $1,126,000.00 for the year.

Expenditures for actual operations during 1963 exceeded $250,000.00. Defendant also contributed acreage support for another company's well in Section 23 which was a dry hole. A field study was conducted to determine possibility of further development. Two wells were drilled in Sections 13 and 24, both completed as oil wells in the Oswego Lime.

During 1964 $256,000.00 was spent completing two Oswego oil wells in Sections 13 and 22. Defendant participated with other operators in an extensive, detailed engineering field study looking toward field unitization, and alternative secondary recovery proposals.

In 1965 defendant contributed acreage support for wells in Sections 3 and 17 which tested the Oswego formation. Both

were abandoned as dry holes. During 1966 defendant conducted a separate study for field-wide unitization. Seismic information was traded with another operator to obtain seismic coverage east and southeast of Union's block in Sections 16 and 17. Seismic re-evaluation of this data was submitted to company management. In 1967 defendant re-evaluated all data obtained to ascertain whether additional seismic work was indicated for evaluation of these leases. Defendant then contributed 320 acres to support another company's well in Section 17, off-setting Section 21 diagonally northwest. This well projected to test the Hunton Lime below 14,000 feet, at estimated cost in excess of half million dollars, was drilling at the time of trial. Contemporaneously defendant participated in three geological feasibility evaluations concerning possible development of formations other than the Oswego in this area. If the Hunton test in Section 17 was successful defendant intended to begin development of the Hunton structure in the area.

From 1958 to trial date defendant drilled and completed nine gas wells, twelve oil wells, and four dry holes in the Oswego formation. Expenditures amounting to $4,460,000.00 were made for exploration and development in the immediate area. During this period defendant independently conducted extensive geological and geophysical surveys, and also participated in engineering field studies relating to field unitization, gas cycling to enhance production, and alternative secondary recovery proposals. Drilling operations resulting in dry holes or marginal wells had defined the southern limits of the Putnam Oswego field in Township 16 North, in which plaintiff's interest is located.

This conclusion is supported by evidence showing a marginal gas well in Section 16, a dry hole in Section 17, a marginal oil well in Section 22, a dry hole in Section 23, and a marginal well in Section 24. The only expert testimony in this record is that a reasonably prudent operator would not drill an Oswego formation well in Section 21, and defendant was awaiting the outcome of the Hunton test (S½ of Section 17) before further commitment as to Section 21.

Primary term of the lease on Section 21 expired December 13, 1961. The evidence summarized established field limits, defendant's continued efforts and imminent possibility of development. The trial court, however, referred only to the length of time Section 21 had been "hanging here in the air" with nothing done, and decreed cancellation. Not only was there no evidence a reasonably prudent operator would have drilled an Oswego formation exploratory well in this section, but defendant's evidence showed lack of feasibility. Thus, from the evidence in this record, it is apparent the trial court canceled the lease solely upon the basis of lapse of time.

Defendant contends the judgment should be reversed because: (1) Evidence introduced by plaintiff is not sufficient to support a cause of action for cancellation; (2) even should the court find defendant violated an implied covenant for diligent development of the Oswego formation, it would be inequitable to cancel zones below the Oswego Lime.

In answer to the first contention plaintiff asserts defendant's complete failure to develop the lease involved, and relies upon decisions in: Sand Springs Home v. Clemens, Okl., 276 P.2d 262, restating the rule from Doss Oil Royalty Co. v. Texas Company, 192 Okl. 359, 137 P.2d 934; Coal Oil and Gas Company v. Styron, Okl., 303 P.2d 965.

The basic rule stated in Doss, supra, is relied upon as controlling in that a lessee cannot hold a lease for an unreasonable time for speculative purposes in disregard of lessor's rights, since equity demands development within reasonable time or surrender of the lease. In Styron, supra, we held unfavorable geologic data and experience upon surrounding land could not support lessee's position, when other evidence showed lack of present or future intention to drill. This attitude was said not to be in accord with obligations to develop with

diligence. In Styron this Court simply applied the Doss rule in canceling the undeveloped portion of a lease where, *after notice and demand for development,* the lessor specifically disclaimed intention of further development.

Although the decision in Doss, supra, is cited more frequently, recognizable qualification of that rule was stated in Ferguson v. Gulf Oil Corp., 192 Okl. 355, 137 P.2d 940, 943:

"The rule laid down in the Doss case is to protect the lessor from the inequality of position that exists between the lessor and the lessee and to correct the inequity arising from the failure of a lessee to carry out the purposes for which the lease was given, yet it is a rule of equity and should be applied only where it will effectuate justice. It should not be used to permit a lessor to secure cancellation so that he may sell a new lease on the land at a speculative price made possible by large expenditures of a lessee in drilling nearby tests. Neither should it be used to penalize a lessee for the exercise of caution in the conduct of an expensive and hazardous enterprise, which if successful will aid both lessor and lessee. These facts distinguish this case from the Doss case."

Settled rules controlling actions for cancellation of oil and gas leases for failure to develop have been stated many times. The lessor bears the burden of establishing breach of the covenants. Whether breach of the implied covenants has occurred must be tested by the ordinary prudent operator's test. A lessor seeking cancellation of an undeveloped portion of a lease, for lessee's failure to comply with implied covenants for development, must show " * * * probable costs of drilling, equipping and operating the well or wells, which lessor contends should have been drilled, that oil or gas would probably have been discovered thereon, and that the amount thereof would probably have been sufficient to have yielded a reasonable profit upon the total outlay." See

syllabus 3, Texas Consolidated Oils v. Vann, 208 Okl. 673, 258 P.2d 679. These requirements were reiterated more recently in Spiller v. Massey & Moore, etc., Okl., 406 P.2d 467.

In part, the real basis for the results reached in the cited cases is aptly stated in Covenants Implied in Oil and Gas Leases, Merrill (2 ed.) Section 69, @ 176:

"Of course there are limitations and boundaries hemming in the demands which may be made by lessors. Only reasonable development may be required. There is no duty to embark upon deeper drilling if adjacent operations indicate its futility. Moreover, it seems reasonable that, except for the period of exploratory activity, there must be some reasonable ground to anticipate production in the lower horizons before deep drilling becomes a duty. The lessor ought not to demand that his lessee shall be a perpetual wildcatter. Even as to the exploratory operations, it seems wiser to insist that there should be at least some geological evidence suggesting a reasonable chance of success before one who has discovered a gas field should be called upon to prosecute further search as to oil. * * *".

See Blythe v. Sohio Pet. Co. (10th Cir.) 271 F.2d 861; 79 A.L.R.2d 774.

A number of decisions have refused cancellation where no development has been carried on for considerable time. In Skelly Oil Co. v. Boles, 193 Okl. 308, 142 P.2d 969, there had been no development for sixteen years. In Shell Oil Co. v. Lee, Okl., 258 P.2d 666, thirty four years elapsed after drilling of first well. Fourteen years elapsed after the last well was drilled, and only two wells had been drilled on entire 120 acre tract.

In Boles, supra, there had been cessation of production for 7 years, and no drilling had been done for 16 years. A judgment canceling the lease was reversed, for the reason lessee had done preliminary work looking toward investigation of deeper

sands, and had entered into negotiations with other operators to divide costs of expensive, deep tests. Essentially the same circumstances existed in both the Lee and Howell cases cited.

In no decision reviewed, including others not cited, is there an instance where cancellation for breach of implied covenant to diligently develop has been decreed solely by reason of lapse of time. We recognize, however, in some instances unreasonable delay in further development may shift the burden of proof to lessee, to show the lessee acted as a reasonable prudent operator under the circumstances. The burden of proof under which the lessor was required to show the elements enumerated in the Vann case, supra, was not discharged. Rather, the evidence introduced by defendant clearly met the requisites specified in Boles, supra. Equity abhors a forfeiture. Cancellation of defendant's lease clearly was inequitable. Sinclair Oil and Gas Co. v. Bishop, Okl., 441 P.2d 436.

We are of the opinion the trial court's judgment finding lessee failed to comply with the implied covenants to diligently develop was erroneous as a matter of law under this record. In view of our conclusion, consideration of defendant's argument relative to application of the principle of partial cancellation, expressed in Barnes v. Mack Oil Co., Okl., 376 P.2d 279, is unnecessary.

In Boles, supra, we observed that reversal of the trial court's judgment did not mean that further delay would be condoned, or that the lessee could not interpret the decision as license not to proceed with development. To avoid uncertainty, the judgment of the trial court is reversed. The cause is remanded with directions to vacate that judgment and enter judgment for defendant, under requirement for definite action within 90 days after issuance of mandate.

All Justices concur.

