John R. PETERSEN and Nellie E. Petersen, husband and wife, Plaintiffs,

v.

EL PASO NATURAL GAS COMPANY, a corporation, Defendant.

Glen G. PETERSEN and Sue Petersen, husband and wife, Plaintiffs,

v.

EL PASO NATURAL GAS COMPANY, a corporation, Defendant.

Belva Mae NEWSOM and G. L. Newsom, wife and husband, Plaintiffs,

v.

EL PASO NATURAL GAS COMPANY, a corporation, Defendant.

Nos. CIV–77–0251–D, CIV–77–0252–D and CIV–77–0253–D.

United States District Court, W. D. Oklahoma.

June 30, 1978.

Tom Hieronymus, Henry A. Meyer, III, Woodward, Okl. (all cases), for plaintiffs.

Robert J. Emery, Oklahoma City, Okl., David T. Burleson, El Paso, Tex. (all cases), for defendants.

## MEMORANDUM OPINION

DAUGHERTY, Chief Judge.

In these three consolidated cases the Plaintiffs seek the cancellation of a portion of an oil and gas lease and a judgment for money damages for alleged offset drainage of said portion. The oil and gas leases of Plaintiffs, as to which partial cancellation is sought, cover a 240-acre tract of land in Section 8 and an adjacent 320-acre tract of land immediately south in Section 17, both Sections being in Township 13 North, Range 24 West, in Roger Mills County, Oklahoma. Plaintiffs seek to cancel that part of the leases in Section 17 and Plain-

tiffs also claim that Section 17 has been and is being drained by a producing well in Section 8. The legal description of these tracts of land are as follows·

The Southeast Quarter (SE/4) and East Half of the Southwest Quarter (E/2 SW/4) of Section Eight (8), Township Thirteen (13) North, Range Twenty-Six (26), W.I.M.

The North Half (N/2) of Section Seventeen (17), Township Thirteen (13) North, Range Twenty-Six (26), W.I.M.

The Plaintiffs (husband and wife) in each case own identical mineral interests in the above lands as follows:

An undivided 48.38-acre interest in the tract in Section 8 and an undivided 51.62-acre interest in the tract in Section 17 which totals 100 mineral acres per each of the three sets of Plaintiffs in the two sections.

Each lease of the Plaintiffs was executed on September 1, 1971 with a five-year primary term. By assignment of said leases the Defendant became the lessee of the same. The leases are located in an area known as the West Reydon Field in western Oklahoma which is productive of natural gas from various sandstone intervals in the Upper Morrow formation, such intervals being called the Puryear Sand, the Hollis 1 Sand and the Hollis 2 Sand. The principal producing interval is the Puryear Sand. The discovery well in the field is located approximately three miles northeast of Section 17.

Spacing was fixed by the Oklahoma Corporation Commission at 640 acres for Section 8 of the lease. At the time this suit was filed Section 17 had not been spaced. During the fourth year of the term of the five-year lease Defendant drilled a producing well in the extreme northwest corner of Section 8. This well is known as the Petersen Number 1. This well was drilled trouble free and cost $1,583,000.00. Plaintiffs share in this production in accordance with their mineral interests in the spaced unit. This well has continually produced since its completion in May of 1975. Fifteen days after the five-year expiration date on the

leases arrived Plaintiffs demanded that Defendant drill a well in Section 17 asserting that the Defendant had breached the covenant for diligent development and the covenant for protection from drainage. Defendant replied to the effect that it had complied with all the terms and conditions of the leases and was conducting its operations in a prudent manner. Defendant further stated that it would continue to review developments in the area in accordance with its obligations and requirements under the leases. Plaintiffs then brought their actions herein on March 21, 1977. At that time there were no producing wells in any 640-acre section or in any area of land equivalent to a 640-acre section directly or diagonally offsetting Section 17, except the Petersen Number 1 Well which was approximately 3960 feet north of the northern boundary of Section 17.

In *Texas Consolidated Oils v. Vann*, 208 Okl. 673, 258 P.2d 679 (1943) the Court held:

"After the service of notice for additional development was served by the lessor, the obligation of the lessee to develop further under said lease is suspended until the settlement of the controversy. *Gibson & Jennings, Inc. v. Amos Drilling Co.*, 196 Okl. 143, 162 P.2d 1002."

In the above general factual situation the Court must determine whether Defendant when the consolidated suits were filed herein had breached the covenant to further develop the oil and gas lease by failing to drill a well in Section 17 and whether there has been a drainage of gas from Section 17 by the offsetting well in Section 8 entitling Plaintiffs to money damages. Under Oklahoma law, which is applicable in these diversity cases, it is settled that Plaintiffs have the burden of proof by a preponderance of the evidence on these issues. *Doss Oil Royalty Company v. Texas Company*, 192 Okl. 359, 137 P.2d 934 (Okl.1943); *Texas Consolidated Oils v. Vann, supra*. In the cases at hand the lapsed periods from lease execution and completion of the Section 8 well within the lease to suit institution were respectively approximately 5½ years and 21

months. In *Sun Oil Company v. Frantz*, 291 F.2d 52 (Tenth Cir. 1961), our Circuit said in an Oklahoma case:

"In the case now before us the elapsed periods from lease execution and completion of last well to suit institution were respectively 10 and 2½ years. It is implicit in the lessors' position that these intervals constitute an unreasonable delay. While each case must stand on its own facts and the time factor is not all controlling, it should be noted that this court has not as yet ruled in favor of cancellation of an Oklahoma lease when the time intervals were as short as those here presented. A determination of unreasonable delay affects only the question of burden of proof to establish compliance with, or violation of, the prudent operator rule. Regardless of whether lessors or lessee had that burden, it was shouldered by the lessee who introduced evidence of its exploratory and drilling operations. We prefer to judge the question of diligence on the entire record. In such a situation all pertinent factors, including time, must be considered."

*Texas Consolidated Oils v. Vann, supra,* quotes the Oklahoma prudent operator rule as follows:

"The test prevailing in this State for determining a breach of the implied covenants to drill additional wells and to protect the lease premises from drainage by wells on adjoining lands is 'the ordinary prudent operator test'. It requires the lessee to do whatever in the circumstances would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, but neither is the arbiter of the extent to which, or the diligence with which, the operations shall proceed. The burden of proving the breach of these implied covenants is upon the plaintiff."

The above case also held that whether such due diligence had been exercised depends upon the facts and circumstances of each case.

In these consolidated cases the evidence reveals that the drilling and completing of a well in Section 17 will cost approximately $2,400,000.00 if drilled trouble free. In this high pressure gas field it is not unusual to encounter serious and expensive drilling problems. The well in Section 8 is producing at a daily rate of 1.3 million cubic feet of gas. Its estimated recoverable reserves are 2.28 billion cubic feet of gas. Said well when depleted will have recovered only approximately 1½ times its cost. Federal regulatory orders may even prevent this well from making a profit. No one can tell about this at this time. Defendant is an extensive operator in this field. Approximately 34 wells have been drilled in this field since the discovery well in mid-1970. Of the above number of wells the Defendant has participated in 21 wells. In addition Defendant has farmed out five additional wells. Its drilling expenditure has exceeded $10,000,000.00 in this field. No definite trend has been shown since the discovery well. Wells have been drilled in all directions. Some have been producers and some have not. The field is generally rather spotty for production. A productive sand zone present in one well may be and often is completely missing in an offset well. Production also varies from well to well. There are dry holes to the northwest and southwest of Section 17 and to the northeast there are dry holes in Sections 2 and 12. Since this suit was filed a well has been drilled in Section 9 to the east of Section 8. It appears to be a producer. A well is now being drilled generally west of the Petersen Number 1 which well is northwest of Section 17. Defendant has participated in both these wells. There is some doubt among experts that production can be obtained from Section 17 or that the same will make a profit. This section may be on the edge or even outside the field. It is approximately three-quarters of a mile south of the southwestern-most well in the field.

Though there is some dispute among the experts as to the result of a well in Section 17, which does not surprise the Court as such is always the state of expert testimony in a controversy of this kind, the

Court finds and concludes from the record herein that the Defendant has not been indifferent to the possibilities of development in Section 17. Defendant has actively and effectively promoted development in the field and has expended considerable money and acreage to the full and timely exploration of the field. Defendant was entitled as a prudent operator to wait and analyze the result of the well drilled in Section 9. Defendant is further entitled to wait and analyze the result of the well now drilling to the west of Section 8. There is no indication of reluctance by Defendant to diligently proceed with exploratory work. Defendant is entitled to proceed in orderly development and is not required to proceed in reckless development. *Sun Oil Company v. Frantz, supra.* In this case with the passing of only 21 months since the completion of the well in the drilling unit to the north (Section 8), the condition of this well, with a well drilling in the section east thereof (Section 9), and a well drilling or to be drilled to the west of Section 8, the cost of a well in Section 17, the knowledge obtained through the years about this field and the opinions of its qualified personnel as to the outcome of a Section 17 well, the Court is not convinced that the Defendant was not proceeding as a prudent operator would under the circumstances here present. The Court therefore finds and concludes that the Defendant has proceeded as a prudent operator with reference to further development in Section 17 and declines to cancel the lease as to Section 17 thereof for non-development at this time. The Defendant, however, remains under the obligation to comply with the implied covenant requiring further development. *Sun Oil Company v. Frantz, supra.*

1. The only well draining Section 17 according to Plaintiffs' Answers to Written Interrogatories herein is the well in Section 8.

2. Oklahoma does not appear to have ruled on this point but the Fifth Circuit has in a Texas case with opinion written by Judge Breitenstein of our Circuit. This case is *Foster v. Atlantic Refining Company*, 329 F.2d 485 (Fifth Cir. 1964) which provides:

As to the issue of Section 17 being drained by the well in Section 8,[1] the Court is not convinced by the evidence that such is the case. Nor that the well in Section 9 will drain such acreage. The evidence indicates and the Court finds and concludes that no drainage has been caused to the lands in Section 17 by the Section 8 well and by the Section 9 well as well. The Section 8 wellhead shut-in pressure tests together with production figures reflect no significant drainage to Section 17. The Petersen Number 1 Well had a pressure decline from 15,528 pounds in March of 1975 to 6,016 pounds in July of 1977. This reveals a drainage from said well of around 200 acres and such drainage could not reach Section 17. Likewise, shut-in pressure tests in the well in Section 9 indicate no drainage of Section 17.

Moreover, Plaintiffs' lease provides:

"In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within three hundred thirty feet (330 ft.) of and draining the leased premises, lessee agrees to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances."

The well in Section 8 is not within 330 feet of Section 17. It is approximately 3960 feet from Section 17. No producing well has been brought in on adjacent land which is within 330 feet of the leased premises nor could one be brought in under 640-acre spacing without a location exception granted by the Oklahoma Corporation Commission. If this express provision negates the implied covenant to prevent offset drainage Plaintiffs have no ground to complain of being drained by the Section 8 well by reason of the express terms of their contract.[2] As Oklahoma has not ruled on this

"The lease provision calls for 'an offset well.' This means that for each well drilled within the 650-foot strip Atlantic is required to drill one—not more than one—offset on the Foster lease premises. The Fosters seek to rely on the implied obligation to protect against drainage. This implied covenant has been superseded by an express agreement and the express agreement controls.[16]

point and the Court need not rule on the same herein the Court does not decide this issue in favor of Defendant on such lease clause. The evidence which the Court believes to be persuasive indicates that there is now no drainage by any well from any producing formations in the field which may be under Section 17. Plaintiffs have not sustained their burden regarding their drainage claim for money damages.

By reason of the foregoing the action of each of the Plaintiffs in each of the consolidated cases should be dismissed. Judgments will be entered this date by the Court to this effect.

[16] See *Hutchins v. Humble Oil & Refining Co.,* Tex.Civ.App., 161 S.W.2d 571, 573; *Coats v. Brown,* Tex.Civ.App., 301 S.W.2d 932, 935–937."