Maggie E. CROCKER et al.,
Plaintiffs in Error,

v.

HUMBLE OIL & REFINING COMPANY, a
Corporation, et al., Defendants in Error.

No. 40613.

Supreme Court of Oklahoma.

Aug. 3, 1965.

Rehearing Denied Nov. 9, 1965.

Application for Leave to File Second Petition
for Rehearing Denied Feb. 1, 1966.

As Corrected Oct. 24, 1966.

Motion in Nature of Application for
Third Petition for Rehearing
Denied Oct. 25, 1966.

Fischl, Culp & McMillin, Earl Q. Gray, Ardmore, George C. Baldridge, Joplin, Mo., N. E. McNeill, Jr., Tulsa, for plaintiffs in error.

A. L. Deaton, Joseph A. Gill, Tulsa, James K. Schooler, Oklahoma City, Otey, Johnson & Evans, by Geo. N. Otey, Ardmore, for defendant in error Humble Oil & Refining Co.

HODGES, Justice.

This is an appeal and cross appeal from the district court of Carter County, Oklahoma, involving a judgment cancelling an oil and gas lease in part and issuing an alternative decree of cancellation in part.

On July 15, 1919, the oil and gas lease in question was executed covering ninety acres. The lease was subsequently divided into two parts—one part, containing forty acres, hereinafter referred to as the Humble-Bennett tract, was assigned to the defendant, Humble Oil & Refining Co., and the remaining fifty acres, hereinafter referred to as Carter-Bennett tract, was assigned to the Carter Oil Company. The lease had a primary term of five years. The lease was separately developed until 1929 when Humble assigned its interest in the lease to Carter Oil Company. Shortly prior to the filing of this action the Carter Oil Company and Humble Oil & Refining Company were acquired by the Standard Oil Company of New Jersey and merged into the present defendant, Humble Oil & Refining Company.

This action was commenced by Earl O. Gray as plaintiff below, now a plaintiff in error, who is owner of one-half of the royalty under the Humble-Bennett tract and one-quarter of the royalty under the Carter-Bennett. The different royalty owners were made parties defendants as to each tract. All royalty owners under the Humble-Bennett appeared and joined in the plaintiff's prayer. All but two of the royalty owners under the Carter-Bennett appeared and joined in the plaintiff's prayer. Defendants, Raymond Mc-Collom and Maxine Noonan Cross, did not appear, though served with process.

We will herein refer to all royalty owners as plaintiffs, and to the Humble as the defendant.

The relief sought by the plaintiffs was cancellation of the oil and gas lease of the defendant in respect to each ten acre tract covered by the lease on which a presently producing well was not located. The trial court entered judgment in two parts as follows:

"First: That the oil and gas lease held by the defendant be and the same is hereby cancelled insofar as the same covers or affects the following described land:
W½ of W½ of NW¼ of Section 16, Township 4 south, Range 2 West, Carter County, Oklahoma,
save and except as to the royalty owners Raymond Mc-Collom and Maxine Noonan Cross, who have not appeared herein or applied for any relief.

"Second: That insofar as said lease in question covers the NW¼ of NE¼ of NW¼ of Section 16, Township 4 South, Range 2 West, Carter County, Oklahoma,

the same shall be cancelled as to all royalty owners, unless the defendant within sixty days from the date the judgment herein becomes final shall commence the drilling of a well thereon to a sufficient depth to test the Second Hewitt Sand."

The plaintiffs have appealed from that portion of judgment designated therein as "Second" above quoted. The defendant has appealed from that portion of the judgment designated as "First."

The history of the development of the lease shows the following: That the defendant has drilled a total of six wells on the lease in question, four of which are presently producing oil in paying quantities. One well, the C. E. Bennett No. 1, was drilled at the center of the SW¼ NW¼ NW¼ of Section 16 in 1921, and completed as a dry hole. The other well not now producing was drilled in the center of the NW¼ NE¼ NW¼ of Section 16 known as the Humble-Bennett No. 2, and was completed as an oil well in the First Hewitt sand. It produced from the First Hewitt sand until 1922, when it was deepened to the Second Hewitt sand. It produced from the Second Hewitt sand until 1936, at which time it was plugged because it no longer produced in paying quantities. No well has ever been drilled on the NW¼ NW¼ NW¼ of said Section 16, or on the W½ SW¼ NW¼ of said Section 16. The trial court further found that at the time of the filing of this action the period of time that had elapsed since the drilling of the last well on the lease was 37½ years, and that the period of time that had elapsed since the last drilling of a well deeper on the lease was 36 years.

As to the Northeast 10 acres of the Humble-Bennett tract, which is the acreage affected by the trial court's alternative decree, no oil has been produced from the First Hewitt since September, 1922, or from the Second Hewitt since 1936.

The defendant's first drilling on the lease was in 1920 when the Humble-Bennett No. 1, as shown by the plat thereof, was completed and is presently produc-

Ls.#23877
Humble

Hewitt Walker

Skelly

A.C. Cruce

Skelly

Humble
Ls#17378

Humble
Bennett Tract

G.M. Gazaway
Ls.#20690-³/₄
Humble

Carter-Bennett Tract

G.M. Gazaway

Texas Co.

16

F.A. Shellenberger

LEGEND
● Producing Well
✗ Plugged Oil Well
✛ Dry Hole

MAP OF LEASE INVOLVED
AND ADJACENT TRACTS
(OR PORTIONS THEREOF)

ing from the First Hewitt sand. In 1921 the defendant drilled the Carter-Bennett No. 2 and the Carter-Bennett No. 3 to the First Hewitt and in 1922 to the Second Hewitt, and said wells are currently producing from the First Hewitt sand.

The lease is surrounded by producing wells on the North, East and South. The NW¼ NW¼ NW¼ of Section 16 is offset to the North by the Hewitt Walker No. 20 which is producing from the First Hewitt sand. The NW¼ NE¼ NW¼ of Section 16 has since 1922 been offset by producing wells from the First Hewitt sand on three sides and on all four diagonal directions, two of such offsets and three of such diagonal offsets being on other lands and leases than that here involved.

The plaintiff, Earl Q. Gray, first acquired royalty interest in the Humble-Bennett tract in 1924 or 1925, and a few years later purchased royalty interest in the Carter-Bennett tract. The plaintiff's first contact with the defendant in regard to the operation of the lease was by letter on November 4, 1948, wherein he called attention to the reduction in the amount of the royalty checks and damage to the property by pulling inside strings of casing and letting in water. The plaintiff received no answer and on November 18, 1948, personally visited the office of the defendant, but found no one who was in a position to discuss the matter. On November 19, 1948, he sent by registered mail a letter containing the same matter and also requested the defendant to drill additional wells on the vacant portions of the Carter-Bennett. The defendant answered the letter explaining the difficulty and that the request to drill or surrender the lease was being processed through regular channels. On April 21, 1949, the plaintiff again expressed his concern in the operation of the lease and requested that if the defendant was not going to drill any more wells that the undeveloped portion of the lease be assigned to him. The defendant answered on April 26, 1949, that all possible care was being exercised

and that the defendant has prudently discharged its obligation. The request for additional wells or assignment to the plaintiff was not mentioned. The next correspondence between the parties was on September 30, 1959, when the plaintiff requested of the defendant by letter to commence additional drilling within sixty days on both tracts, or that the lease as to the undeveloped portions be surrendered. On October 14, 1959, the defendant replied by letter advising that they were in the process of initiating a waterflood project on the acreage which would result in greater recovery than possible through primary methods.

On January 31, 1962, the defendant by amendment to its answer in this case offered to drill a well on the NW¼ NW¼ NW¼ of said Section 16 and on the NW¼ NE¼ NW¼ of said Section 16.

The plaintiff first contends for reversal of the trial court's alternative decree that the great lapse of time alone was sufficient cause for cancellation without proof that further drilling would pay.

█ In support of this proposition the plaintiff cites the following cases: McKenna v. Nichlos, 193 Okl. 526, 145 P.2d 957; Texas Consolidated Oils v. Vann, 208 Okl. 673, 258 P.2d 679; Wolfson Oil Co. v. Gill, Okl., 309 P.2d 282, and Skelly Oil Co. v. Boles, 193 Okl. 308, 142 P.2d 969. In each of these cases we pointed out that "a court of equity may, in a proper case" or "when delay in development is of unconscionable duration," cancel the undeveloped portion of an oil and gas lease. The general rationale of these cases is that when the lessor has established a prima facie case of unreasonable or unconscionable length of time in developing and operating a lease, the burden of proof is upon the lessee to excuse this delay. In Wolfson Oil Co. v. Gill, supra, the lessee maintained that it would not be economical to drill additional wells on the undeveloped portion of the lease, and unlike our case, refused to recognize the potentiality of the

lease and did not make any offer to drill. We said in syllabus No. 3:

"In an action to cancel an oil and gas mining lease for breach of implied covenants to diligently develop and operate the leased premises, the rule that the burden is upon the lessor to show that an ordinarily prudent operator would have drilled additional wells is not to be applied after the lapse of an unreasonable length of time."

In Kunc v. Harper-Turner Oil Company, Okl., 297 P.2d 371, we stated:

"It has been held that where there has been an unreasonable length of time between the last well drilled and an action to have lease cancelled for failure to drill, the lessee has been required to assume the burden of proof to justify delay. We think this rule is fair and just when coupled with the rule that the lessee should have notice and demand for further development and have a reasonable time to commence operation before an action to cancel the lease is commenced."

We also held in Magnolia Pet. Co. v. Rockhold, 192 Okl. 628, 138 P.2d 809, that:

"Where production is obtained during the primary term of a lease, and it is disclosed that the lessee has failed and refused to fully develop the leasehold within a reasonable length of time and there has been unreasonable delay in development a prima facie case is made in an action by the lessor to cancel the undeveloped portions thereof and the burden is upon the defendant lessee to show that the lease has been developed in the manner reasonably to be expected of an operator of ordinary prudence."

■ While a long delay in development is not in and of itself sufficient basis for cancellation of an oil and gas lease it is incumbent upon the lessee to adequately explain such delay. Even a prudent operator must excuse his unreasonable delay. Trust Company of Chicago v. Samedan Oil Corp., 10 Cir., 192 F.2d 282.

It is the duty of a lessee to diligently develop his lease. In Doss Oil Royalty Co. v. Texas Co., 192 Okl. 359, 137 P.2d 934, we stated:

"To permit the lessee to hold the lease for an unreasonable length of time for merely speculative purposes, is to allow him to protect his own interest and to disregard the interest of the lessor. If conditions do not indicate to him that further development will be profitable, it is but fair that, after a reasonable time has expired, he surrender the undeveloped portions of the lease and allow the lessor to procure development by others or assume the burden of showing why in equity and good conscience the undeveloped portion should not be cancelled so that the owner may, if possible, get it developed by others."

■ In Wolfson Oil Co. v. Gill, supra, we stated "[i]f the purpose of the lease (reasonable development) has ceased to exist lessee cannot complain that the undeveloped portion thereof be cancelled." The lessee cannot sit idly by, either he must develop the lease or he must excuse or explain his inactivity. The length of time is not the sole criteria. A reasonable delay in one case may be unconscionable in another. In adjudging the delay as reasonable or unreasonable depends on the evidence in each particular case. Neff v. Jones, Okl., 288 P.2d 712.

■ In Skelly Oil Co. v. Boles, supra, we said:

"Just how long such delay can be excused as conscionable depends in each case upon the circumstances rather than upon the precise time which has expired."

In the Doss case, supra, we held that fourteen years was an unreasonable length of time for the lessee to hold the undeveloped portions of the lease without drilling, in the absence of any showing of special circumstances justifying the non-development. The testimony in the instant case shows that up to the filing of this

case 37½ years had elapsed since the drilling of the last well on the lease by the defendant, and 36 years since the last deepening of a well. We deem such a length of time unreasonable and unconscionable. The testimony further shows that the plaintiff on September 30, 1959, notified and demanded of the defendant additional drilling within sixty days.

It therefore follows from the enunciation promulgated by this court that in determining whether a delay in this case in drilling is of unconscionable duration, sufficient for cancellation of the lease in question, it is necessary for us to examine the record and determine if the lessee defendant has sustained the burden of proof by sufficiently explaining and justifying the delay.

The defendant contends its action and development of the lease in question was proper and prudent in light of the circumstances then existing and in harmony with known skills and knowledge. The defendant contends that no reasonable or prudent operator would drill additional wells on the lease until after the advent of sandfracing.

The trial court said in his findings:

"The court finds that the drilling of another well on said NW¼ NE¼ NW¼ of Section 16 would not have been a prudent or paying operation until after the discovery and availability of hydraulic-fracturing process, but that after such time the drilling of such well would probably be a profitable and paying proposition."

Mr. T., a petroleum engineer, in testifying for the defendant said there was no reason to believe that a twin to the No. 2 Humble-Bennett would encounter any better sand. That the Hewitt-Walker No. 6 which was the north offset to the Humble-Bennett No. 2 had been cased off from the First Hewitt in 1922, and that the Hewitt-Walker No. 3 which was a northeast offset to the Humble-Bennett No. 2 was plugged in the First Hewitt on June 25, 1936. He testified that this caused him to believe that a poor sand condition prevailed in the immediate vicinity of Humble-Bennett No. 2.

He further testified that after the Humble-Bennett No. 2 was plugged in 1936, after having reached its economic limit, which had been producing from the Second Hewitt sand from 1922 to 1936, it would not have paid to drill a second well at this location and anytime thereafter, up until the advent of sandfracing in this pool. The testimony also showed rather conclusively, and to which fact the trial court found, that initially the pool contained a solution gas drive, but that said energy had dissipated as an effective driving force by the mid-thirties. Plaintiff's witness Fort was asked when he would have recommended drilling another well on the NW¼ NE¼ NW¼ of Section 16, and he answered "subsequent to the initiation of fracture treatments."

The testimony showed that sandfracing was first discovered in 1948 and was first used commercially in 1949. It was used at certain places in Southern Oklahoma in 1950 and 1951. Sandfracing was first used in the Hewitt Pool in 1956. The first time the defendant used the fracing process in the Hewitt Pool was in January, 1957. Mr. Fort, plaintiff's witness, testified that he did not know of the use of sandfracing in the Hewitt Pool prior to 1956. He was asked on cross-examination whether all operators in the Hewitt Pool should be considered imprudent if no operator in that pool fraced their wells before 1956. His answer was "no."

The defendant then contends that while the evidence indicates that a paying well could probably have been drilled on the NW¼ NE¼ NW¼ of Section 16 in 1957, and thereafter, with the use of the sandfracing process the delay in drilling a new well thereafter was justified because of the pendency of the waterflood unit negotiations, and further drilling would interfere and interrupt such negotiations. In this respect the testimony of the defendant was that in February, 1957, Mr. Bert Thompson was sent to Purcell, Oklahoma, from Carmi, Illinois "for the express purpose of carrying on the work that had been done before on the proposed Hewitt waterflood, to bring

to a conclusion, if possible, to continue the engineering studies, and to initiate the necessary work with other operators to reach an agreement to form a unit." Mr. Thompson spent fourteen months in studying and making preparation for the proposed waterflood, and with his recommendation the proposal for waterflooding was approved by the defendant about the middle of the year 1958. A committee was formed with other operators interested in a waterflooding program in Section 16. The committee's work continued until March, 1960, at which time work was suspended because a participating formula could not be agreed upon. It was pointed out in the defendant's testimony that the great hope for future production on this lease was in secondary recovery and that the proposed waterflooding unit would recover from Section 16 much more oil than by primary methods.

In 1950 the district exploration manager for the defendant at Ardmore was engaged in an extensive study of the Hewitt Pool and these studies occupied about a year's time.

■ The plaintiff contends that the evidence shows that prior drilling would pay and the trial court so found, but erred in giving only twenty-five per cent effect to his finding by not cancelling the undeveloped portion of the lease in the NW¼ NE¼ NW¼ of Section 16. Although in light of new developments and techniques in the field of geology it now appears that a second well drilled in any direction from the No. 2 Humble-Bennett should encounter better First Hewitt sand and would be profitable, the standard of prudent operations to which a defendant should be held responsible is determined by the skills and knowledge then available. The testimony of both the defendant and plaintiff shows that after the depletion of the gas energy in the mid-thirties to the advent of sandfracing further drilling would not pay. During the period of effective gas solution drive the evidence does not show where the defendant was imprudent in the operation of the lease with the information, knowledge and techniques then existing.

The plaintiff also contends that there has been drainage from both the northwest ten acres and the northeast ten acres. The trial court made the following finding:

"That from 1922 until the mid-1930's there probably was some drainage from the First Hewitt sand under said NW¼ NE¼ NW¼ but that it would be impossible to determine how much of such drainage was to other leases and how much thereof was back on to the lease here involved."

The plaintiff points out that this ten acres was offset by two direct wells and three diagonal offset wells.

The evidence shows that the producing structure in Section 16 was "down dip" to the west and south, but mostly to the west. The structure goes down 220 feet from the east side of this ten acre tract to the west side.

The evidence is rather substantial that during the period 1922 to 1936 that drainage from the First Hewitt sand occurred, but having determined that the action and conduct of the lessee during this time was prudent and in conformity with known practices in this technical field the lessee's failure to drill is excusable.

The evidence of drainage from the year 1936 is conflicting. The plaintiff's testimony would show that there is some gas energy available sufficient to push the oil in any direction in which there is an outlet; meaning the offset wells. The defendant's evidence is that there is no solution gas of effective force and that the drainage, if any, would follow the pull of gravity which would be down-dip and away from the offsetting wells.

The evidence supports the trial court's finding that the Humble-Bennett tract has produced 123 barrels of oil per acre foot of sand; that the Hewitt-Walker lease, as shown by the plat hereof, has produced 138 barrels of oil per acre foot of sand; that the Skelly-Cruce lease has produced 114

barrels of oil per acre foot of sand; that the Skelly-Gazaway lease has produced 123 barrels of oil per acre foot of sand; that the Carter-Bennett tract of the lease here in question has produced 341 barrels of oil per acre foot of sand; that the Humble-Gazaway lease has produced 245 barrels of oil per acre foot; and that the Texas Company Shellenberger lease has produced from 292 to 343 barrels of oil per acre foot of sand.

■ We have examined the record and while the evidence is conflicting, we have repeatedly refused in a number of decisions to reverse the judgment of the trial court in a case of equitable cognizance unless it is clearly against the weight of the evidence. Booker v. Lawmaster, Okl., 373 P.2d 237.

We cannot say the judgment of the trial court was clearly against the weight of the evidence in finding that if there was any drainage from the mid-thirties from the First and Second Hewitt sands in the NW¼ NE¼ NW¼ of Section 16 it was not substantial.

■ In view of the above testimony and findings of the trial court we find that the defendant did adequately and sufficiently explain and excuse his delay in further development on the NW¼ NE¼ NW¼ of Section 16, at least to the extent such conduct warranted an alternative decree to commence drilling on this ten acre tract within sixty days from the date of the final judgment thereof.

In its cross-appeal the defendant contends that the portion of the trial court's judgment in cancelling the oil and gas lease as to the W½ W½ NW¼ of Section 16 was erroneous, taking into consideration its activity and conduct in operation of the lease, and that there is no evidence a paying well could have been drilled at any time.

The trial court found that the undeveloped northwest ten acres (NW¼ NW¼ NW¼ of Section 16) is offset to the north by a well drilled and operated by the defendant and has been so offset since 1926, and "that there undoubtedly has been some drainage of said northwest 10 acres by

said offset." The trial court further found that a well drilled on this acreage would have been profitable at any time since 1926, "although there is some doubt as to whether such drilling would have been profitable during a period from about 1935 to 1950."

The defendant excused his failure to drill in the NW¼ NE¼ NW¼ after the advent of the sandfracing process for the reason that there was a tacit agreement among the operators to withhold fracing until the waterflooding program. The evidence however, disclosed no obligation as to the acreage not included in the program. An important distinguishing factor of this portion of the judgment is that none of the forty acres cancelled was included in the defendant's waterflooding program. The evidence shows that one of the main factors in determining the participating formula is not only the past productivity of the acreage, but the current production as well. Defendant's witness Thompson admits that no unit participates unless it has some oil to contribute to the unit. It thus appears that if the defendant intended to include such acreage after the program was initiated (as it suggested could be done) it would be more beneficial and advantageous to drill before being joined in the unit.

Mr. Riley in testifying for the defendant said that a location for a well in the NW¼ NW¼ NW¼ of Section 16 would be attractive. Plaintiff's witness Fort testified that the drilling of the Hewitt-Walker No. 20 in 1926 confirmed a desirable location for a well in the NW¼ NW¼ NW¼. The evidence supports the finding that a well drilled on the NW¼ NW¼ NW¼ would have been profitable at any time since 1926 except possibly during the period from 1936 to the use of sandfracing. During this delay in drilling it is reasonable to conclude that there has been some drainage since 1926 off the NW¼ NW¼ NW¼ by the Hewitt-Walker No. 20 which offsets the ten acres to north, especially prior to the depletion of the gas solution drive.

■■ As to the W½ SW¼ NW¼ and the SW¼ NW¼ NW¼ of Section 16 in ad-

dition to omitting it from the waterflooding program the defendant has not drilled a well since 1921. Their activity has been nil. Even defendant's witness Riley admitted that "the three ten acre tracts along the west side * * * could possibly prove attractive, with the data from the well in the NW¼ NW¼ NW¼." Plaintiff's witness Fort said that after the drilling of the Hewitt-Walker No. 20 it confirmed a desirable location on the northeast corner of the SW¼ NW¼ NW¼. If the defendant had been prudent in the drilling of a well on the NW¼ NW¼ NW¼ then it may have very well furnished additional information and control for the drilling of more wells in the lower ten acres. We conclude from these facts, that the lessee would hold such acreage for speculation only. In such case the royalty owners are being deprived of delay rentals and/or bonuses, while at the same time prevented from getting full development of their land. In the Doss case, supra, we said:

> "If defendant's theory is correct, it may hold the land without further development as long as production from the present wells continues in paying quantities, regardless of how long that may be. The courts and text writers condemn such attempts of lessees to so indefinitely freeze the undeveloped portions of oil and gas leases, hold them for speculative purposes, and thus prevent the owners from getting full development of their land."

The defendant admits the use and value of sandfracing. During the years 1957–1961 the defendant sandfraced 100 wells. The defendant cannot offer any reasonable excuse in its failure to utilize the sandfracing process for further development of the cancelled portion of the lease.

The defendant also contends that the court should take into consideration the defendant's activity in securing production from the deeper sands. The defendant claims it has drilled deeper three wells in Section 16 to depths below the Pennsyl-

vanian and drilled one well deeper offsetting Section 16 (SE corner of the SW¼ of Section 9) for the same purpose. In addition it drilled a well in the northeast corner of Section 21. The defendant points out that all the old wells drilled deeper are within one-half mile of the boundaries of this lease.

Apparently the trial court did not consider such activity and we think properly so. The well drilled by the defendant in the northeast corner of section 21 in 1951 to a depth of 7500 feet does not show to have any relation to the lease in question. The other wells drilled deeper were among ten wells drilled in that vicinity from around 3200 to 3500 feet deep. Seven were drilled by others. It appears that with this many wells in one close locality the purpose of the drilling was for oil and not for control or to find how deep the Arbuckle would be under plaintiff's land. In any event, the deeper activity is so marginal that such activity would not toll the neglect and inactivity of the upper sands.

We therefore conclude that the defendant did not sufficiently sustain the burden of excusing or explaining its unreasonable delay.

The plaintiff then contends that the trial court's refusal to cancel all non-producing acreage after finding grounds for cancellation was error. Plaintiff says there is no authority for cancelling the lease as to a part of the non-producing acreage and leaving it in force as to other parts of the non-producing land. That every Oklahoma case in which cancellation has been granted is an authority for cancelling all, not just a part of the non-producing acreage.

In Wolfson Oil Co. v. Gill, supra, we stated that "a suit for cancellation of the undeveloped portion of a producing oil and gas lease is of equitable cognizance and is governed by principles of equity."

In Ferguson v. Gulf Oil Corp., 192 Okl. 355, 137 P.2d 940, we said:

> "In the Doss case we laid down the rule that in such cases the courts may require

operators to drill or suffer forfeiture *of such undeveloped portions,* unless the circumstances of a particular case make it inequitable to do so." (Emphasis ours.)

█ It is apparent upon reason that a lessee may neglect a portion of an oil and gas lease, while prudently tending to another portion of the same lease. If so, it may be inequitable to penalize a lessee by extending a cancellation to the entire undeveloped portion of the lease. Each case should be governed by its own facts within the principle of equitable justice.

█ In the present case the lessee did drill a well in the NW¼ NE¼ NW¼ and produce from the ten acres until 1936. In the W½ W½ NW¼ the defendant has not drilled a well since 1921. In the northeast ten acres, while there was substantial drainage from the First Hewitt from 1922 to 1936, there was production from the Second Hewitt sand. There has been no production from the cancelled acreage. The northeast ten acres was also included in the defendant's waterflooding program, while the W½ W¼ NW¼ was excluded. Another added difference is the lease itself. Soon after the execution of the lease in 1919, forty acres (Humble-Bennett tract) were assigned to the Humble Oil & Refining Co., and fifty acres (Carter-Bennett tract) were assigned to the Carter Oil Company. The royalty owners followed in part a similar division conveying different interests in the royalty. While we do not feel it necessary to determine whether the obligations of the lease are separate, the mention of it is noteworthy in determining the validity of the split judgment of the trial court.

From the above facts it appears that the lessee has operated the lease in such a manner that equity demands a divisible judgment as rendered by the trial court.

Judgment affirmed.

HALLEY, C. J., JACKSON, V. C. J., and DAVISON, IRWIN, BERRY and LAVENDER, JJ., concur.