Warren H. CARTER and Marie Carter, his wife et al., Plaintiffs in Error,

v.

UNITED STATES SMELTING, REFINING AND MINING COMPANY, a Foreign Corporation et al., Defendants in Error.

UNITED STATES SMELTING, REFINING AND MINING COMPANY, a Foreign Corporation et al., Plaintiffs in Error,

v.

Warren H. CARTER and Marie Carter, his wife et al., Defendants in Error.

No. 42534.

Supreme Court of Oklahoma.

May 25, 1971.

Erwin & Erwin, Chandler, for plaintiffs in error.

Milton C. Craig, Chandler, for defendants in error.

McINERNEY, Justice.

This action was commenced by the owners of land under an oil and gas lease, executed on January 12, 1956, seeking a decree canceling the lease, herein called the Carter lease, covering the Northwest Quarter of Section 24, Twp. 13 N, Range 5 E, Lincoln County, Oklahoma, except the producing well site which is in the North Half of the Northwest Quarter of the Northwest Quarter of Section 24, and seeking an award in damages. The prayer for lease cancellation was based upon the alleged failure of the lessee's assigns to comply with the covenant implied in the oil and gas lease to drill an additional well or wells. The prayer for damages was based upon the alleged failure of the lessee's assigns to comply with the covenant implied in the oil and gas lease to protect the leased premises against drainage. More than 30 days prior to the commencement of the action, Plaintiffs demanded in writing that United States Smelting, Refining and Mining Company (Defendant) execute a release of the Carter lease, except the producing well location or that Defendant, within 30 days commence operations for drilling another well on the leased premises and for drilling an offset well on the Northeast Quarter of the Northwest Quarter of Section 24. This demand was rejected.

The Plaintiffs' request for a jury trial on the issue of damages was denied.

The trial court after a full hearing rendered judgment canceling the oil and gas lease as prayed for by Plaintiffs but denied Plaintiffs' prayer for damages alleged by Plaintiffs to have resulted from Defendants' failure to protect the leased premises against drainage. Both Plaintiffs and Defendants appealed and will be referred to herein by their trial court designations.

We deem it necessary to first recite facts related to the exploration and development of the involved petroleum reservoirs concerning which there is no dispute. The first and only well drilled on the Carter lease herein referred to as the Carter well, located 750 feet east and 330 feet south of the northwest corner of Section 24, was a dual completion on October 13, 1959, 4196 feet to 4210 feet in the Hunton Lime and 4440 feet to 4447 feet in the Second Wilcox Sand. On August 31, 1966, less than a year prior to the trial date, the Carter well had produced 36,670 barrels of oil and 16225 mcf of gas from the Hunton and 21,886 barrels from the Second Wilcox. The cost of drilling, completing and equipping this well was $73,153.58 and the average monthly operating expense was $283.00. To August 31, 1966 the gross value of the ⅞ working interest oil and gas was $90,957.90 from the Hunton and $34,355.22 for oil only from the Second Wilcox.

At the time of trial the Carter well was producing 8 barrels of oil and 4 barrels of water per day from the Second Wilcox compared to 18 barrels of oil on the completion date and was producing water free oil from the Hunton upon completion, and 60 barrels of oil and 3 barrels of water per

day at the time of trial. Admittedly this well, as of the time of trial, when it was producing its top allowable from the Hunton, was a commercial producer.

The abutting quarter section to the north of the producing Carter well on the NW/4 of Section 24 is the SW/4 of Section 13. On the west 80 acres thereof is the producing Young lease and on the east 80 acres is the producing Kalka lease. Both leases on the SW/4 of Section 13 are owned and operated by one or more of the defendants, including the United States Smelting, Refining and Mining Company. The Young No. 3 offsetting the Carter well and completed less than two months before the Carter well on August 22, 1959, is a dual completion, producing, like the Carter well, from the Hunton and the Wilcox. On August 31, 1966 the Young No. 3, now producing 70% water, had enjoyed about the same production from the Hunton as the Carter well and almost twice as much as the Carter from the Wilcox. Admittedly the Young No. 3 is a commerical producer. In fact, there are six wells on the SW/4 of Section 13 producing from the Second Wilcox, 3 on the Young lease and 3 on the Kalka lease. There are five wells on the same quarter section producing from the Hunton, two on the Young lease and three on the Kalka lease. In the Kalka No. 1 located in the Southwest Quarter of the Southeast Quarter of the Southwest Quarter of Section 13, which is to the north of the northeast quarter of the Carter lease, the Hunton Lime and the Second Wilcox Sand were encountered below the water table. The well was later re-worked and completed in the Prue Sand for a marginal but nevertheless a commercial well with initial daily production of 10 barrels of oil and 15 barrels of water. The Carter well was found unproductive in the Prue Sand due to lack of porosity.

There is a pronounced geological structure concerning whose location there is no dispute—the Wilzetta Fault that extends in a northeast to southwest direction, bordering the Carter lease near its northwest corner and extending to the west of the Young wells Nos. 1, 2, and 3, paralleling the anti-clinal trend in this area. Both the geologist Holcomb, testifying for Plaintiffs, and the geologist Stratton, testifying for Defendants, agree upon its location in a general way and agree also there may be cross-faults extending eastward from the main fault. On cross examination Plaintiffs' geologist Holcomb was asked:

"Q Alright now, is it true, also in the general area, Mr. Holcomb, that there are other smaller faults which come off of the main fault?

"A This is probably true—the geological perplexity in the area, although we try with the available subsurface information that we have to represent them as nearly as possible, it is doubtful that we are ever capable of showing them in their best place, the available information shows we are dealing with a highly faulty area."

Geologist Stratton, who sat on all the wells in Sections 13 and 24, in describing the general characteristics of the Wilzetta Fault which he had worked since 1945, said: "Yes, sir, as other geologists describe, is a fault that trends north-northeast south-southwest—basically it has a throw of some 400 feet with the down-throw side on the west side of the fault * * * the fault has several cross-faults or pie-shapes or offshoots from the main fault itself. * * *" Geologist Stratton in referring to a cross fault extending to the Carter, Young and Kalka leases, testified: "Based on the interpretation of the logs, that fault exists and is an offshoot to this Wilzetta Main Fault and it exists more in a northeast-southwest direction lying basically between the Kalka #3 and the Kalka #1 and between the Young #3 and the Kalka #1 and between the Carter #1 and the Kalka #1."

Stratton's conclusion as to the nature of the cross-fault was based principally upon the presence of a very thin Sylvan Shale in Kalka No. 1 which indicated that the Kalka No. 1 had cut a fault.

On the other hand Holcomb testified that encountering the Sylvan Shale at 45 feet in the Kalka No. 1 "is wholly insufficient to justify a fault trend through there—although it becomes fairly complicated to demonstrate this." The witness Holcomb then conducted for the court on a blackboard a very extended demonstration by many oral references to the blackboard that do not appear graphically in the record.

Due to differences in the interpretation of well logs, indicating differences in the position of the water table and the elevation of the Hunton and the Wilcox, there are sharp differences as to the position of anticlinal structures between the Plaintiffs' and Defendants' witnesses Holcomb and Stratton. Stratton finds the Hunton and the Wilcox lower structurally in the south part of the Carter lease. Holcomb concluded there is a structural "high" near the center of Section 24 leading to his opinion that three more commercial wells can be drilled in the Northwest Quarter of Section 24. Stratton finding no structural "high" in the center of Section 24 but placing one near the center of Section 13, concludes that a commercial well to the Hunton and the Wilcox cannot be drilled anywhere on the Northwest Quarter of Section 24 south of the Carter well. Related to this conflict in opinion is a disagreement concerning the amount of saturated sand in the Wilcox on the Carter lease above the water table. Stratton concluded there was 10 feet less than Holcomb found.

Additionally, for geologist Stratton, the cross fault extending between the Carter well and the Young No. 3, placing the Carter lease on the downthrow side of the cross fault, further precludes the possibilities of commercial production on the Carter lease south of the Carter well. This presence of the crossfault for Stratton minimizes the risks of drainage between the Young No. 3 and the Carter well. An offset well to the Kalka No. 1, if drilled in the Northeast Quarter of Northwest Quarter of Section 24, according to geologist Stratton would be water bearing in the Prue, Hunton and Wilcox. This testimony was not effectively or directly disputed by geologist Holcomb. There was controversy over whether the Carter well was drilled off-pattern. The Corporation Commission order of November 27, 1963 indicates an exception was granted for the Carter well. Moreover, this aspect of the controversy did not play any part in the expressed opinions of the geological witnesses.

With this evidentiary background, we now give attention to Plaintiffs' assignment that the trial court erred in failing and refusing to grant the Plaintiffs a jury trial on the issue of damages.

Action for cancellation of an oil and gas lease is one of equitable cognizance, Tidal Oil Co. v. Roelfs, 77 Okl. 183, 187 P. 486 (1920); Sinclair Oil and Gas Company v. Bishop, Okl., 441 P.2d 436 (1968); and that once equity has assumed jurisdiction of the subject matter, it may do complete justice between the parties by retaining the cause and ordering recovery of compensatory damages, Smith v. Owens, Okl., 397 P.2d 673 (1965). As the Plaintiffs construed the trial court's function, they were content to have the trial court decide the issue of liability on both the lessee's obligation to drill an additional well or wells and the lessee's obligation to protect the leased premises against drainage. On the latter obligation Plaintiffs desired that the issue of liability and the issue of damages be separated with the issue of damages left to a jury. As grounds for their assignment of error Plaintiffs cite 12 O.S.Supp.1965, § 323 which reads in part " * * * The court may order a separate trial of any claim or of any issue in the furtherance of a just and prompt determination of the controversy and to avoid delay and prejudice. * * *"

There is completely absent any indication of any legislative intention to modify or repeal 12 O.S.1961, §§ 556 and 557 which have long been regarded as preserving the historic distinction between trials in the common law courts and in equity courts. To repeat, we have long recognized in this

jurisdiction that having jurisdiction of the parties to the controversy, a court of equity has power to decide all matters in dispute and decree complete relief and may accord what would otherwise be legal remedies. Tidal Oil Co. v. Roelfs, supra.

■ The primary purpose of Plaintiffs' petition is to seek cancellation of an oil and gas lease for alleged failure of Defendants to drill additional wells. Although its secondary purpose is to recover damages for Defendants' alleged failure to protect the leased premises against drainage, the proof relevant to each charge is identical: namely, whether lessee can, probably at a reasonable profit, drill an additional well on the Carter lease as a diagonal offset to the Young No. 3 which will protect the leased premises against drainage. Moreover, the proof on both issues is so inextricably related that Plainttiffs contend that the judgment of the trial court decreeing cancellation was tantamount to a liability judgment that Defendants had not protected the leased premises against drainage. In fact, every step taken by Plaintiffs in this action bespoke Plaintiffs' view that this action is primarily one of equitable cognizance in which the issues, in an evidential sense, are closely tied.

Accordingly we hold that the primary relief sought by Plaintiffs was the cancellation of an oil and gas lease and that the additional demand for damages for drainage from the leased premises was incidental and on the basis of the evidence, dependent upon and inextricably related to the action for cancellation. Assuming arguendo that § 323, supra, is applicable, the trial court therefore did not abuse its discretion in denying a jury trial and in retaining, for disposal in one action, all the issues, thus performing the traditional function of equity in affording complete relief. We adopted a similar holding with similar issues in Townsend v. Creekmore-Rooney Company, Okl., 332 P.2d 35 (1958).

Moreover our decisions applicable to the obligation to drill additional wells and the obligation to protect the leased premises against drainage tie the related issues rather closely. In Vickers v. Vining, Okl., 452 P.2d 798 (1969) we said, "Defendants, in effect, argue that there is no implied obligation on the part of a lessee to drill an offset well to a well on adjoining premises or to drill an additional one on the leased premises except where the drilling of such well would probably result in production of sufficient oil to repay the cost of drilling, equipping and operating such well. This is the applicable rule we announced in Spiller v. Massey & Moore, Okl., 406 P.2d 467." The rule is also applicable here.

■ Plaintiffs next contend that the trial court's judgment in canceling the Carter lease, except as to the site around the Carter well, was tantamount to a judgment that defendant did not protect the leased premises against drainage. The trial court's assigned reason for cancellation was Defendants "failure to develop said oil and gas lease." Plaintiffs assume that the basis for the trial court's judgment was the implied finding that Defendants could probably drill an additional well on the Carter lease resulting in production of sufficient oil to repay the cost of drilling, equipping and operating such well. The sustainable basis for the trial court's judgment was the implied finding that the sole reason for Defendants' desire to hold the undeveloped areas of the Carter lease is sheer speculation absent any contemplated ensuing benefits for lessors.

Since the completion of the Carter well on October 13, 1959 no additional well had been commenced at the time this action was instituted on November 29, 1965. The demand made by Plaintiffs for an additional well had been refused. During this six year period one or more of the same Defendants had drilled six producing wells to "The Wilcox" and 5 producing wells to "The Hunton" and one producing well to "The Prue" on the quarter section immediately to the north of the Carter lease. Relevant to this lease history, J. B. Red, Production Superintendent for Defendant

United States Smelting, Refining and Mining Company, said on cross examination,

"Q The purpose of the Company in trying to hold this lease for just the possibility of something developing in the future that might be worthwhile and somebody else might solve or there might be some particular means to recover for itself—that's the purpose of the company, isn't it?

"A I can agree with most of that, Yes, sir.

"Q You have no plans to drill any part of the Carter lease, do you?

"A To date, No, sir.

"Q You don't think, geologically, and have so advised the Company, that it is not good business to drill any other wells on this Carter lease?

"A For commercial production at this time, no."

This same witness indicated it might be necessary to drill a well at some future time on the northwest quarter of the Carter lease for secondary recovery purposes. Additionally, to indicate Defendants were still interested in efforts to evaluate the Carter lease, Defendants encouraged the drilling of a well in 1965 by the Christie-Stewart Drilling Company in the Southeast Quarter of the Northeast Quarter of Section 23 immediately west of the Carter lease. This well was drilled close to the Wilzetta Fault and was dry, six years after the Carter well was completed.

We conclude that the implied finding that Defendants are holding the Carter lease for sheer speculation and without any purpose for future development is not clearly against the weight of the evidence. Crocker v. Humble Oil and Refining Company, Okl., 419 P.2d 265 (1966), Syl. 4.

 The Defendants contend that the judgment cancelling a part of the lease is not sustained by sufficient evidence. In the following cases where we upheld partial cancellation for lack of justification in delaying development, Defendants empha-

size certain points. Defendants point out that fourteen years had elapsed since the last well was drilled in Doss Oil Royalty Co. v. Texas Co., 192 Okl. 359, 137 P.2d 934 (1943). In Doss six wells were drilled on a 40 acre lease and ten wells were drilled on a 100 acre lease. In McKenna v. Nichlos, 193 Okl. 526, 145 P.2d 957 (1944), twenty-two years had elapsed after two wells were drilled on 40 acres. Here, six years elapsed after one well had been drilled on 160 acres. After a review of our holdings in cases involving delays in development of oil and gas leases we concluded in Crocker v. Humble Oil and Refining Company, Okl., 419 P.2d 265, 270 (1966) that "The lessee cannot sit idly by, either he must develop the lease or he must excuse or explain his inactivity. The length of time is not the sole criteria. A reasonable delay in one case may be unconscionable in another."

In Coal Oil and Gas Company v. Styron, Okl., 303 P.2d 965 (1956) the oil and gas lease (Styron lease) executed May 6, 1948 covered 220 acres. On June 30, 1951 the lessee completed a commercial producer. Although lessee completed an oil producer that was an offset to the west and an oil producer that was an offset to the north, no more wells were drilled on the Styron lease. Eighteen producing wells had been drilled to the west, south and southwest of the Styron well. The action in this case was instituted only three years after the Styron well was completed. Failure to further develop and protect against drainage was alleged. The lessee desired to retain the lease because it was a good size and there was a possibility of a separate reservoir to the east of the Styron lease. In concluding that lessee's reason for wanting to hold the lease was not sufficient, we said, "Though there is production on a small portion of the Styron lease, such cannot justify the defendant's holding the balance indefinitely and thereby depriving the lessors not only of the expected royalty * * * but of the privilege of making some other arrangement * * *" Where, as here, a commercial producer is drilled

on the Carter lease to the Hunton and the Wilcox and thereafter six producing wells are drilled to the Wilcox and five producing wells to the Hunton are drilled by the same lessee on the quarter section immediately to the north, more explanation is needed than was given here to excuse the six years delayed development on the Carter lease.

 Turning to the question of drainage, we hold that the trial court's implied finding that Plaintiffs did not suffer any drainage is not clearly against the weight of the evidence. If the cross-fault existed, passing near the north line of the Carter lease or the south line of the Young and Kalka leases, drainage would be greatly minimized if not prevented. We are mindful of the conflict in opinion set forth above between Plaintiffs' geologist Holcomb and Defendants' geologist Stratton, the former concluding that there is no basis for saying that the Kalka No. 1 had cut a fault, the latter saying to the contrary. The conflict in the evidence is resolved by the judgment of the trial court. Resolution of the issue by the trial court is not clearly against the weight of the evidence. Additionally, a sustainable basis for denying Plaintiffs any relief from Defendants' refusal to drill a protection well is the implied finding that drillng such a well would probably not result in production of sufficient oil to repay the cost of drilling, equipping and operating.

We hold that the trial court's judgment of lease cancellation, because the lessee is holding the Carter lease for sheer speculation and without contemplation of any future benefit to lessor Plaintiffs is not clearly against the weight of the evidence. We hold that the trial court's judgment that Plaintiffs did not suffer drainage, or in the alternative, that a protection well if drilled would probably not result in the production of sufficient oil to repay the cost of drilling, equipping and operating

such well is not clearly against the weight of the evidence.

Affirmed.

All the Justices concur.